## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARON DANTZIG, | Case No. 16 Civ. 07097 (LLS) |
| Plaintiff, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| ORIX AM HOLDINGS, LLC, ORIX ASSET MANAGEMENT, LLC, ORIX AM INVESTMENTS, LLC, ORIX GAM, LLC (f/k/a ORIX USA ASSET MANAGEMENT, LLC), ORIX CORPORATION, and ORIX USA CORPORATION, | |
| Defendants, and | |
| NEW HEALTH CAPITAL PARTNERS GP LLC; NEW HEALTH CAPITAL PARTNERS MANAGEMENT LP; NEW HEALTH CAPITAL PARTNERS MANAGEMENT GP LLC, and NEW HEALTH CAPITAL PARTNERS FUND I, LLC, | |
| Nominal Defendants. | |

Plaintiff Aron Dantzig, by and through his undersigned counsel, alleges as follows:

### NATURE OF THE ACTION

1.      Plaintiff seeks recovery from Defendants for: (i) breaches of the various written contracts entered into by and between the parties; (ii) inducing the breaches of those contracts, (iii) breach of the covenant of good faith and fair dealing, (iv) tortious interference with contracts, (v) tortious interference with prospective economic advantage, (vi) breach of fiduciary duty and (vii) imposing a constructive trust upon ORIX AM Investments, LLC, based on Defendants' conduct in taking control of and dissolving a private-equity fund (Nominal Defendant New Health Capital Partners Fund I, LLC) and management company previously

managed by Plaintiff (collectively, Nominal Defendants New Health Capital Partners GP LLC, New Health Capital Partners Management LP, and New Health Capital Partners Management GP LLC).

2.      In September 2011, Plaintiff Aron Dantzig ("Dantzig") and a third party, Richard Baxter ("Baxter"), on the one hand, and the Defendants, on the other, entered into an agreement where Dantzig and Baxter would operate healthcare-focused private-equity funds through an entity named New Health Capital Partners ("NHCP") and Defendants would be investors. Defendants committed $150 million of investment capital to NHCP. This amount was committed in two parts: (1) a $100 million capital commitment to New Health Capital Partners Fund I ("Fund I"), a healthcare private-equity fund, and (2) a $50 million capital commitment to a second healthcare private-equity fund (referred to as "Fund II"). In exchange, Dantzig and Baxter agreed to manage the investments of both funds, as co-portfolio managers, for at least two years after the launch of Fund II.

3.      Based in substantial part on Dantzig's efforts, the NHCP partnership and Fund I were extremely successful. Within approximately seven months of launching Fund I, NHCP had made successful investments for the entire $100 million commitment. Projections had Fund I generating at least a 14% gross unlevered return over the course of these investments, or approximately $40-$50 million of gross profit for Defendants. In addition, NCHP's efforts to raise Fund II had been successfully launched, with a first closing on Fund II expected soon.

4.      Defendants brought all of this to a halt in violation of the agreements between the parties. The precipitating event was Baxter's stated intention to resign as a partner and co-portfolio manager from NHCP.

5.      Thereafter, Defendants met with Baxter in secret to enlist Baxter's help in a plan to reap the benefits of Fund I but deprive Dantzig of his contractual share of the management fees and carried interest incentive income related to Fund I.

6.      As for Baxter, Defendants earned his cooperation by releasing him from a litany of onerous post-deal restraints and non-competition agreements that would otherwise have severely limited his ability to work.

7.      Defendants sought to avoid, and have avoided, paying millions of dollars in fees and carried interest incentive income to Dantzig and sought to avoid making good on their capital commitment and ongoing management fees owed to NHCP for Fund I and Fund II.

## JURISDICTION AND VENUE

8.      Plaintiff initially filed a summons with notice in the New York Supreme Court on June 24, 2016. Jurisdiction in that court was based on the agreements between the parties and the conduct committed within New York and that caused injury to Dantzig in New York. N.Y. C.P.L.R. §§ 301 and 302.

9.      On September 12, 2016, Defendants removed this matter to this Court. Thus, the burden is on Defendants to establish jurisdiction and venue in this Court.

## PARTIES

10.      Plaintiff Aron Dantzig is an individual residing at 7117 N. 68th Place, Paradise Valley, Arizona.

11.      Defendant ORIX AM Holdings, LLC is a Delaware limited liability company with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201.

12.      Defendant ORIX AM Investments, LLC is a Delaware limited liability company with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201.

13.     Defendant ORIX GAM, LLC is a Delaware limited liability company with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201. ORIX GAM, LLC was formerly known as ORIX USA Asset Management, LLC.

14.     Defendant ORIX USA Corporation is a Delaware corporation with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201.

15.     Defendant ORIX Asset Management, LLC is purported to be a Delaware limited liability company with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201. Several of the agreements between the parties are signed by "ORIX Asset Management LLC, a Delaware limited liability company" in addition to the other ORIX entities. Also, Defendants sent correspondence in this matter as "ORIX Asset Management, LLC." The Secretary of State of Delaware has no records of this "company" and Defendants claim it does not exist. (Dkt. No. 1 at ¶ 6). ORIX Asset Management, LLC is named as Defendant in this action should it be found to have a separate identity from the other ORIX entities.

16.     Defendant ORIX Corporation is a Japanese corporation with its principal place of business located at World Trade Center Bldg., 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo, 105-6135, Japan. ORIX Corporation's policies and practices required it to be involved in and approve decisions by the other ORIX entities with respect to investments of the size of ORIX's investment in NHCP. Individuals involved in ORIX's decision-making and conduct with respect to Dantzig and NHCP were jointly employed by ORIX Corporation and other ORIX defendants.

17.     All Defendants, ORIX AM Holdings, LLC, ORIX AM Investments, LLC, ORIX GAM, LLC, ORIX USA Corporation, ORIX Asset Management, LLC, and ORIX Corporation, are referred to collectively herein as "ORIX."

18.     With respect to the conduct described herein, ORIX acted jointly and without consideration of the particular entities at issue. ORIX's decision-making power was centralized among a handful of individuals and those individuals made decisions on behalf of all ORIX entities. In discussions with Dantzig, ORIX did not differentiate between the various Defendants here.

19.     Nominal Defendant New Health Capital Partners GP, LLC is a Delaware limited liability company with its principal place of business located at 1350 Avenue of the Americas, 9th Floor, New York, New York 10019.

20.     Nominal Defendant New Health Capital Partners Management, LP is a Delaware limited partnership with its principal place of business located at 1350 Avenue of the Americas, 9th Floor, New York, New York 10019.

21.     Nominal Defendant New Health Capital Partners Management GP, LLC is a Delaware limited liability company with its principal place of business located at 1350 Avenue of the Americas, 9th Floor, New York, New York 10019.

22.     Nominal Defendant New Health Capital Partners Fund I, LLC is a Delaware limited liability company with its principal place of business located at 1350 Avenue of the Americas, 9th Floor, New York, New York 10019.

23.     New Health Capital Partners GP, LLC, New Health Capital Partners Management, LP, New Health Capital Partners Management GP, LLC, and New Health Capital Partners Fund I, LLC are collectively referred to herein as "NHCP."

24.     Attached hereto as Exhibit A is a chart of the agreements between the parties and the definitions of those documents used herein.

## FACTS

25.     Dantzig and Baxter had previously worked together for approximately six years for the same employer.

26.     Together, Dantzig and Baxter approached ORIX about ORIX funding a private-equity vehicle.

27.     In September 2011, Dantzig, Baxter, and ORIX entered into an agreement where Dantzig and Baxter would operate healthcare-focused private-equity funds through NHCP and Defendants would be a seed investor in NHCP.

28.     At that time, ORIX committed $150 million in capital to NHCP. First, pursuant to the express terms of the Service Agreements, and in conjunction with the various other NHCP agreements, ORIX agreed to make a $100 million capital commitment to New Health Capital Partners Fund I ("Fund I"), a healthcare-focused private-equity fund.

29.     Second, ORIX made a $50 million capital commitment to NHCP's next healthcare-focused private equity Fund (referred to as "Fund II") provided certain delineated conditions were met.

30.     In exchange, Dantzig and Baxter each agreed to devote their full efforts to managingORIX's investments in NHCP and maximizing NHCP's value for at least two years after the launch of Fund II. (*See, e.g.*, Services Agreements § 2).

31.     In addition, Dantzig and Baxter agreed to onerous Confidentiality, Non-Competition and Non-Solicitation provisions ("Dantzig Non-Compete Agreement" and "Baxter Non-Compete Agreement") which restricted their activities until 18 months after their employment ended.

32.     Fund I launched in September 2011. NHCP's investments for Fund I were very successful.

33.     Within approximately seven months of launching Fund I, NHCP had fully committed the entire $100 million in capital of the fund in three investments. By 2019, Fund I was projected to generate at least a 14% gross unlevered return, or approximately $40-$50 million of gross profit for ORIX. One of those investments would have resulted in a gross profit to ORIX of approximately $18 million by June 2014 on that one transaction alone. Over this same time period to 2019, Dantzig's compensation from Fund I was projected to total approximately $2.7 million in salary and approximately $2.5 million in carried interest incentive income.

34.     In addition, NHCP had substantially met the preconditions stated in the governing documents for Fund II, which would have triggered ORIX's $50 million commitment and its continuing obligation to pay management fees. (*See, e.g.*, Investment Agreement § 7.01; Operating Agreement § 5.12; Management GP Operating Agreement § 5.12; Management LP Agreement § 5.14). By May 2013, NHCP had commitments of approximately $50 million from two blue-chip institutional investors for Fund II, and additional institutional investors were performing due diligence in contemplation of a commitment to Fund II.

35.     Compensation for Fund II would be additive to the compensation described above for Fund I. Plus, with this opportunity to bring in additional investors, the economic magnitude for Fund II and the resulting opportunities were significantly greater.

36.     Notwithstanding these successes, on May 10, 2013, Baxter informed Dantzig that the previous day (May 9, 2013), he (Baxter) had informed ORIX that he intended to resign from NHCP.

37.     At the time the agreements were drafted, the parties had specifically contemplated an event of resignation by either Baxter or Dantzig prior to the second anniversary of the closing of Fund II. The documents explicitly describe the contemplated procedures, economic impact, and mechanism for replacing the resigning partner. (*See, e.g.*, Operating Agreement §§ 5.1, 5.2, and 13.5 and Schedules A-1, A-2, and A-3; Management GP Operating Agreement §§ 5.1, 5.2 and 13.5; Management LP Agreement § 5.2). They included the remaining individuals proposing a replacement partner and the parties consenting to the replacement.

38.     Also, pursuant to the terms of the agreements, resignation triggered the forfeiture of certain compensation and equity interests of the resigning partner and the potential to reassign them to a replacement. (*See, e.g.*, Operating Agreement § 13.5 and Schedules A-1, A-2, and A-3; Management LP Agreement § 13.5). Baxter's resignation should have triggered these forfeiture provisions.

39.     Further, Baxter was subject to the Baxter Non-Compete Agreement after his resignation from NHCP, including restrictions on the types of business for which he could work and restrictions on the potential employees, clients, and investors he could solicit.

40.     Baxter wanted ORIX and NHCP to waive the restrictive covenants of the Baxter Non-Compete Agreement, including the relevant provisions restricting the solicitation of NHCP employees.

41.     Upon learning of Baxter's intention to resign, ORIX deliberately and prematurely began to end NHCP's operations, without making a good faith effort to work with Dantzig to preserve and optimize the partnership value of NHCP, including NHCP's management of Fund I and Fund II, as well as refusing to assist Dantzig in his efforts to replace Baxter. ORIX thus violated its express and implied obligations to Dantzig and to NHCP. (*See, e.g.*, Services

Agreements § 4; Fund I LPA Article IV; Management GP Operating Agreement § 5.6; Management LP Agreement § 5.8).

42.     Dantzig, on the other hand, made significant efforts to abide by the various agreements and to preserve NHCP's value.

43.     First, Dantzig tried to convince Baxter to reconsider his decision and remain with NHCP. Baxter made clear that he was not considering leaving due to any type of misconduct by Dantzig or NHCP, instead, he was just interested in moving on.

44.     Second, when it became apparent that Baxter would not reconsider, Dantzig began transition planning. In June 2013, Mr. Dantzig sent ORIX several presentations concerning transition plans, including plans to replace Baxter.

45.     A potential replacement candidate Dantzig proposed was highly qualified. ORIX, however, refused even to consider the applicant, in violation of its implied covenant of good faith and fair dealing and its fiduciary duties to the partnership and its partners. (*See, e.g.*, Operating Agreement § 5.1(a); Management GP Operating Agreement § 5.1(a)). Similarly, when Dantzig proposed three other highly-qualified candidates, ORIX refused to consider any of them.

46.     ORIX also refused Dantzig's efforts, on July 1, 2016, to schedule a Board of Directors meeting for early July 2013 to proceed with the transition planning. (*See, e.g.*, Operating Agreement § 5.1(c)). Rather than fulfill its obligation to preserve the value of NHCP (which included working in good faith to find a replacement Key Person for Board membership), ORIX deliberately and in violation of the relevant agreements, stopped paying contractually-owed management fees to NHCP, eliminated NHCP's on-going partnership value, assumed control over its operations, refused to go forward with Fund II, and ultimately expelled Dantzig.

(*See, e.g.*, Management GP Operating Agreement §§ 5.1(a) and 5.6; Management LP Agreement § 5.8).

47.     Instead of cooperating with Dantzig's efforts, ORIX secretly met with Baxter in May and June 2013 without Dantzig's knowledge—conduct explicitly prohibited by the governing documents—and came to the following agreement with Baxter. (*See, e.g.*, Management GP Operating Agreement § 5.10; Management LP Agreement § 5.12; Management LP Agreement § 5.14). ORIX agreed not to enforce the Baxter Non-Compete Agreement and to provide Baxter with certain severance benefits and, in exchange, Baxter agreed to vote with ORIX and otherwise cooperate in prematurely ending NHCP's planned operations going forward, thus broadly depriving Dantzig of his earned and prospective contractual compensation as a member and partner in NHCP and withdrawing ORIX's capital commitment to Fund II. (*See, e.g.*, Services Agreements § 4; Fund I LPA Article IV; Operating Agreement § 14.1; Management GP Operating Agreement §§ 5.6, 14.1 and 15.5; Management LP Agreement §§ 5.8, 14.1 and 15.5).

48.     On approximately July 2, 2013, one day after Dantzig requested a meeting of the Board of Directors, ORIX sent a letter to Danzig falsely stating "[ORIX] has no choice but to pursue the dissolution of Fund I [and] the wind-down of NHCP." ORIX made no mention of its side agreement with Baxter and provided no further explanation for this decision that was in the interest of neither NHCP nor Dantzig.

49.     On July 11, 2013, Dantzig responded to ORIX's July 2, 2013 letter stating that he would not agree to resign; would not agree to the dissolution of Fund I; and would not agree to wind down NHCP. Dantzig also referenced the sections of the governing agreements that required "approval of the dissolution of the Company by a Majority-in-Interest of the Non-OAM

Members with the prior written consent of the OAM Member ….." before NHCP could be dissolved. (*See, e.g.*, Management GP Operating Agreement § 14.1; Management LP Agreement § 14.1). Pursuant to the governing agreements, ORIX could not complete its desired dissolution if Dantzig refused to vote with ORIX to do so.

50.     In the July 11, 2013 letter, Dantzig further invoked his rights as a member, principal, and Director of NHCP to be "actively involved with any discussions [ORIX] may have with Baxter about Baxter's potential resignation."

51.     Minutes after receiving Dantzig's July 11, 2013 letter, ORIX sent an email to Dantzig stating that it had decided to provide notice of termination of his employment without cause effective January 11, 2014. This document was signed by both ORIX and Baxter.

52.     At the time it provided notice of future termination of his employment, ORIX forced Dantzig to resign immediately from the Board and from all Board committees.

53.     By providing notification of future termination of Dantzig's employment, forcing him to resign immediately from the Board and all associated committees, and entering into its secret agreement with Baxter, ORIX was able to create the appearance of having the required votes needed to dissolve NHCP and Fund I and thereby avoid ongoing management fees payable to NHCP for Fund I, and future management fees and committed capital obligations to NHCP for Fund II. (*See, e.g.*, Services Agreements § 4; Fund I LPA Article IV; Management GP Operating Agreement §§ 5.6 and 14.1; Management LP Agreement §§ 5.8 and 14.1).

54.     On July 12, 2013, one day after sending Dantzig notice of termination of his employment (effective six months thereafter), ORIX began implementing its immediate and rapid dissolution of NHCP, in a manner contrary to the governing agreements.

55.     Within days of providing Dantzig notice of the future termination of his employment (effective in six months), ORIX and Baxter immediately disseminated to investors and counterparties false information that Dantzig was no longer an employee of NHCP, and that the "Key Man" provision had been triggered—meaning that Dantzig was no longer working for the company. (*See, e.g.*, Operating Agreement § 13.3(b); Management GP Operating Agreement § 13.3(b); Management LP Agreement § 13.3(b); Fund I LPA § 4.11; SBI Co-Invest LLC Agreement § 6.5(c)). In fact, Dantzig remained an employee and member of NHCP until January 11, 2014 and it was, in fact, Baxter that had triggered the Key Man provision by intending to be a "Bad Leaver" as defined in the agreements.[1] (*See, e.g.*, Operating Agreement § 1.1; Management LP Agreement § 1.1). ORIX placed Dantzig in a false light with NHCP's then-existing investors, potential investors, counterparties, service providers, and employees. (*See, e.g.*, Operating Agreement § 13.3(b); Management LP Agreement § 13.3(b); and Management GP Operating Agreement § 13.3(b)).

56.     After receiving notice of his future termination, Dantzig tried to acquire Fund I's assets as part of his continuing efforts to preserve the partnership's value. On August 9, 2013, he sent a letter to Michael Kelly ("Kelly"), then CEO of ORIX USA Asset Management, informing ORIX that he "would like to express [his] earnest interest and financial ability to acquire [all or a portion of Fund I's assets]." Dantzig pointed out that he was extremely familiar with the assets and that he had an obligation to the partners and shareholders of Fund I (including co-investors) to maximize the value of Fund I.

57.     ORIX never substantively considered Dantzig's proposal.

---

[1] Baxter commenced work for a competitor of NHCP within four months of July 2013, rather than the required 18 months, in breach of several of the governing agreements.

58.     On October 1, 2013, Dantzig sent an email to Kelly again "expressing [his] willingness and financial ability (via a financial partner) to acquire the assets which presently reside in New Health Capital Partners Fund I." This time, Dantzig attached to his email a signed letter of financial support from one of the world's largest asset management firms, with assets under management exceeding $300 billion, (Dantzig's "Financial Partner"). Individuals at this Financial Partner also tried to reach out to Kelly several times about their desire to partner with Dantzig and purchase the assets. Kelly did not respond to the Financial Partner's efforts to reach him.

59.     ORIX again did not substantively consider Dantzig's proposal. ORIX never provided any basis for its refusal to even consider Dantzig's offers to acquire Fund I's assets, which was in the best interest of the partnership.

60.     ORIX later sold Fund I's assets to other parties, receiving substantially less value for the assets than the price offered by Dantzig. (*See, e.g.*, Management GP Operating Agreement § 5.6; Management LP Agreement § 5.8). Doing so damaged Dantzig as an investor in Fund I. In addition, ORIX, in violation of the relevant agreements, eliminated NCHP's investment management agreement, and associated economic value, related to a NHCP sponsored co-investment vehicle (the "SBI Co-Investment Vehicle"), that included third party investors. (*See, e.g.*, SBI Co-Invest Investment Management Agreement §§ 1, 2, 7, and 14; SBI Co-Invest LLC Agreement Articles 7.1 and XI).

## DAMAGE TO DANTZIG

61.     As a result of its conduct, ORIX intentionally and wrongfully ended NHCP's operations prematurely. As an owner and investor in NHCP, this damaged Dantzig by denying him: (1) his portion of the compensation and other value built up in NHCP by successfully

operating and managing NHCP, including the fee income related to Fund I, (2) the value of NHCP's investment management agreement with the SBI Co-Investment Vehicle, and (3) the compensation derived from operating and managing NHCP's intended Fund II. (*See, e.g.*, Services Agreements § 4; Fund I LPA Article IV; Operating Agreement § 5.2; Management GP Operating Agreement §§ 5.2 and 5.6; Management LP Agreement §§ 5.2 and 5.8; SBI Co-Invest Investment Management Agreement §§ 1, 2, 7, and 14; SBI Co-Invest LLC Agreement Articles 7.1 and XI).

62.     In addition, under the governing documents, Baxter's intended resignation prior to the two-year anniversary of the Closing of Fund II, would have properly characterized Baxter as a "Bad Leaver", and would have entitled Dantzig to a reassignment of a portion of Baxter's carried interest and management fees, among other compensation and rights. (*See, e.g.*, Operating Agreement § 1.1 and Schedules A-1, A-2, and A-3; Management LP Agreement §§ 1.1 and 13.5). Dantzig did not receive the compensation to which he was entitled.

63.     Further, as of July 1, 2013, the NHCP management company held cash in the amount of approximately $800,000—all of which should have been paid to Dantzig pursuant to the agreements. In fact, Dantzig had already paid taxes on a portion of this compensation. ORIX took this $800,000 from Dantzig when it took control of NHCP. Dantzig has not received any portion of the $800,000.

64.     In addition, ORIX owed NHCP management fees through, at least, the first quarter of 2014 in the amount of at least $706,000. (*See, e.g.*, Fund I LPA § 6.2). ORIX's conduct denied Dantzig his portion of the amount he was owed, which was nearly all of this amount given Baxter's formal and actual separation from NHCP in approximately September 2013.

65.    Dantzig also owned 50% of the carried interest related to NHCP's investment management agreement for the SBI Co-Investment Vehicle, which was worth approximately $1,000,000. Upon Baxter's resignation, Dantzig was also entitled to 50% of Baxter's carried interest on the SBI Co-Investment Vehicle, which represents approximately an additional $500,000. (*See, e.g.*, Operating Agreement Schedules A-1, A-2, and A-3). ORIX intentionally destroyed the value of NHCP's investment management agreement for the SBI Co-Investment Vehicle which intentionally eliminated any portion of the carried interest which would have otherwise been payable to Dantzig. Thus, ORIX's conduct denied Dantzig approximately $1.5 million in carried interest he was owed and otherwise would have received per the terms of relevant agreements, including the SBI Co-Investment vehicle. (SBI Co-Invest Investment Management Agreement § 7; SBI Co-Invest LLC Agreement Articles 3.3, VI, XII).

66.    ORIX's conduct also denied Dantzig the compensation and other benefits he would have received from Fund II. Fund II would have been worth $7,500,000 or more in fees and carry to Dantzig. Given the success of Fund I and ability to make Fund II a larger fund, the value likely value to Dantzig would have been much higher.

67.    Finally, despite that fact that ORIX chose not to enforce the Baxter Non-Compete Agreement against Baxter, ORIX did maliciously enforce the Dantzig Non-Compete Agreement against Dantzig, damaging his ability to work and solicit former NHCP employees for 18 months. In addition, Dantzig would have been the sole remaining decision-maker for NHCP and could, independent of ORIX, enforce the Baxter Non-Compete Agreement against Baxter. (*See, e.g.*, Services Agreements § 9(p)). ORIX intentionally removed Dantzig's ability to enforce the agreement against Baxter and the value doing so had to Dantzig.

## <u>CAUSES OF ACTION</u>

### <u>FIRST CAUSE OF ACTION – BREACH OF CONTRACT</u>
#### <u>(Against All Defendants)</u>

68.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

69.     Plaintiff and ORIX entered into numerous contracts governing their relationship.

70.     To the extent any of the ORIX entities did not directly execute the contracts, they are agents and alter egos of each other with respect to the contracts and knowingly accepted the benefits of the contracts. The ORIX entities acted collectively without regard to corporate formalities.

71.     By its conduct, ORIX breached at least the following provisions of the contracts: Sections 2, 4, and 9(p) of the Services Agreement; Section 7.01 of the Investment Agreement; Sections 5.2, 5.12, 13.3(b), and 14.1 and Schedules A-1, A-2, and A-3 of the Operating Agreement; Sections 5.1(a), 5.1(c), 5.2, 5.6, 5.10, 5.12, 13.3(b), 14.1, and 15.5 of the Management GP Operating Agreement; Sections 5.2, 5.8, 5.12, 5.14, 13.3(b), 13.5(c), 14.1, and 15.5 of the Management LP Agreement, Article IV and Sections 4.11 and 6.2 of the Fund I LPA, Sections 1, 2, 7, and 14 of the SBI Co-Invest Investment Management Agreement, and Articles 3.3, VI, 7.1, 6.5, XI, and XII of the SBI Co-Invest, LLC Agreement.

72.     Plaintiff has been damaged by ORIX's conduct in an amount to be determined at trial. That amount, which includes, but is not limited to, the value of NHCP to Dantzig and the compensation he earned and/or was entitled to under the agreements, exceeds $13,500,000, plus pre- and post-judgment interest and costs.

**SECOND CAUSE OF ACTION – INDUCING BREACH OF CONTRACT
(Against Defendants ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX
Corporation, and ORIX USA Corporation)**

73.     Plaintiff incorporates and realleges all of the foregoing allegations of the
Complaint.

74.     Plaintiff and ORIX entered into numerous contracts governing their relationship.

75.     To the extent ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX
Corporation, and ORIX USA Corporation are not found to be direct parties to the contracts
regarding NHCP, each induced the remaining ORIX Defendants to breach the contracts.

76.     ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX Corporation, and
ORIX USA Corporation each knew of the contracts between ORIX and Plaintiff.

77.     Despite this knowledge, ORIX Asset Management, LLC, ORIX GAM, LLC,
ORIX Corporation, and ORIX USA Corporation knowingly induced ORIX to breach the
contracts such that Dantzig would be denied his contractual benefits.

78.     By their conduct, ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX
Corporation, and ORIX USA Corporation induced ORIX to breach at least the following
provisions: Sections 2 and 9(p) of the Services Agreement; Section 7.01 of the Investment
Agreement; Sections 5.2, 5.12, 13.3(b), and 14.1 and Schedules A-1, A-2, and A-3 of the
Operating Agreement; Sections 5.1(a), 5.1(c), 5.2, 5.6, 5.10, 5.12, 13.3(b), 14.1, and 15.5 of the
Management GP Operating Agreement; Sections 5.2, 5.8, 5.12, 5.14, 13.3(b), 13.5(c), 14.1, and
15.5 of the Management LP Agreement, Article IV and Section 4.11 of the Fund I LPA, Sections
1, 2, 7, and 14 of the SBI Co-Invest Investment Management Agreement, and Articles 3.3, VI,
7.1, XI, and XII of the SBI Co-Invest, LLC Agreement.

79.     Plaintiff has been damaged by ORIX Asset Management, LLC, ORIX GAM,
LLC, ORIX Corporation, and ORIX USA Corporation's conduct in an amount to be determined

at trial. That amount, which includes, but is not limited to, the value of NHCP to Dantzig and the compensation he earned and/or was entitled to under the agreements, exceeds $13,500,000.

**THIRD CAUSE OF ACTION –BREACH OF IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(Against All Defendants)**

80.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

81.     Plaintiff and ORIX entered into numerous contracts governing their relationship.

82.     ORIX was required to meet its obligations and exercise any discretion under the contracts pursuant to the implied covenant of good faith and fair dealing.

83.     ORIX, however, took the conduct described above with the intent to deny Dantzig of his intended benefits under the contracts.

84.     Thus, even where explicit contractual provisions do not govern ORIX's conduct or the contracts provide ORIX with discretion to act, ORIX's conduct breached the implied covenant of good faith and fair dealing with respect to the contracts.

85.     Plaintiff has been damaged by ORIX's conduct in an amount to be determined as trial. That amount, which includes, but is not limited to, the value of NHCP to Dantzig and the compensation he earned and/or was entitled to under the agreements, exceeds $13,500,000.

**FOURTH CAUSE OF ACTION – TORTIOUS INTERFERENCE**
**WITH BAXTER NON-COMPETE AGREEMENT**
**(Against All Defendants)**

86.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

87.     Dantzig would have been the sole remaining managing partner of New Health Capital Partners Management LP. Thus, Dantzig was able to make decisions regarding enforcing the Baxter Non-Compete Agreement against Baxter.

88.     ORIX, in bad faith, intentionally removed Dantzig from that decision-making process and secretly negotiated with Baxter directly with the intent of depriving Dantzig of his bargained for contractual rights under the agreements.

89.     As a result, ORIX intentionally disrupted and eliminated Dantzig's ability, through NHCP, to enforce the Baxter Non-Compete Agreement.

90.     In fact, had Dantzig been able to enforce the Baxter Non-Compete Agreement, Dantzig would have received, and would continue to receive, all of the benefits of NHCP, Fund I, and Fund II.

91.     The fact that Baxter was able to work for a competing business and solicit former NHCP employees while ORIX enforced the Dantzig Non-Compete Agreement against Dantzig resulted in direct and proximate damage to Dantzig's career—including damage to his reputation and loss of compensation—in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH SBI CO-INVESTMENT VEHICLE (Against All Defendants)

92.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

93.     ORIX was aware of the investment management agreements related to the SBI Co-Investment Vehicle. Those agreements involved third parties other than Dantzig, NHCP, and ORIX.

94.     Also as ORIX was aware, those agreements conveyed several substantial benefits to Dantzig.

95.     Dantzig, would have been the sole remaining managing partner of New Health Capital Partners Management LP, and as such, would have been able to honor NHCP's

contractual obligations, and been entitled to the full economic benefits, of the investment management agreement related to the SBI Co-Investment Vehicle.

96.     Despite this knowledge, ORIX intentionally, and in bad faith, disrupted and eliminated Dantzig's rights with respect to NHCP's investment management agreement for the SBI Co-Investment Vehicle by intentionally destroying NHCP's control, and all economic benefits, associated with the investment management agreement and eliminating Dantzig's rights and compensation otherwise due and payable from the SBI Co-Investment Vehicle.

97.     ORIX's conduct directly and proximately resulted in substantial damage to Dantzig, including by denying him: (1) the compensation he was entitled to pursuant to NHCP's investment management agreement for the SBI Co-Investment Vehicle, (2) the value of the SBI Co-Investment Vehicle to Dantzig, (3) and the value of his personal investment in the co-investment, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (Against All Defendants)

98.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

99.     ORIX intentionally and maliciously manufactured a situation where Dantzig needed new employment.

100.    ORIX then chose to enforce the Dantzig Non-Compete Agreement against Dantzig while not enforcing the parallel agreement against Baxter.

101.    ORIX also falsely informed investors, Dantzig's coworkers, and NHCP's counterparties that Dantzig was no longer an employee of NHCP as of July 2013 when he, in fact, remained employed through January 2014. Doing so created the incorrect inference that Dantzig committed some sort of misconduct which would warrant such an abrupt termination.

102.    ORIX further intentionally destroyed the value of NHCP by ceasing its operations, eliminating the track record and other career benefits Dantzig would have received from managing an extremely successful fund.

103.    By this conduct, and others, ORIX intentionally interfered with Dantzig's reputation and ability to find comparable employment, or acted with reckless disregard to the same.

104.    ORIX's conduct directly and proximately resulted in substantial damage to Dantzig's career—including damage to his reputation and loss of compensation—in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION – BREACH OF FIDICIARY DUTY
### (Against Defendants ORIX AM Holdings, LLC, ORIX Asset Management, LLC, ORIX AM Investments, LLC, ORIX GAM, LLC and ORIX USA Corporation)

105.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

106.    Plaintiff and ORIX entered into a joint venture with respect to NHCP.

107.    By virtue of the joint venture relationship, each joint venturer owed a fiduciary duty to the other.

108.    ORIX breached the fiduciary duty to Plaintiff by: (1) secretly negotiating with Baxter, (2) destroying the value of NHCP, (3) intentionally denying Plaintiff the proceeds of NHCP, and (4) paying severance to Baxter that was not owed to him.

109.    Plaintiff has been damaged by ORIX's conduct in an amount to be determined as trial. That amount, which includes, but is not limited to, the value of NHCP to Dantzig and the compensation he earned for his work for NHCP, exceeds $13,500,000.

## EIGHTH CAUSE OF ACTION – QUANTUM MERUIT
### (Against All Defendants)

110.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

111.     Dantzig performed his services for ORIX exceptionally well and in good faith. He reasonably expected to be compensated at an appropriate rate for his services.

112.     ORIX accepted Dantzig's services knowing of Dantzig's expected compensation.

113.     ORIX's conduct denied Dantzig of that expected compensation.

114.     ORIX owes Dantzig the reasonable value of services in an amount to be proven at trial.

## NINTH CAUSE OF ACTION – UNJUST ENRICHMENT
### (Against All Defendants)

115.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

116.     ORIX was unjustly enriched by Dantzig's services.

117.     Dantzig conferred several benefits upon ORIX.

118.     ORIX has unjustly retained and accepted those benefits without adequately or appropriately compensating Dantzig.

119.     Dantzig is entitled to just compensation for the benefit that his services conferred upon ORIX in an amount to be determined at trial.

## TENTH CAUSE OF ACTION – CONSTRUCTIVE TRUST
### (Against Defendant ORIX AM Investments, LLC)

120.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

121.    ORIX AM Investments, LLC and Dantzig are members of New Health Capital Partners GP LLC.

122.    In that capacity, ORIX AM Investments, LLC had a confidential and fiduciary relationship towards Dantzig.

123.    ORIX AM Investments, LLC was aware of the contractual rights and obligations owed to Dantzig.

124.    Dantzig managed New Health Capital Partners Management LP and New Health Capital Partners GP LLC and devoted resources to them in reliance on the contractual rights and compensation he was entitled to receive from them.

125.    ORIX AM Investments, LLC surreptitiously took possession and control of New Health Capital Partners GP LLC and has not made the appropriate management decisions regarding the company or the companies it manages nor made appropriate distributions to Dantzig.

126.    As such, Dantzig is entitled to the imposition of a constructive trust on all assets in the possession, custody, and/or control of ORIX AM Investments, LLC which originated from New Health Capital Partners GP LLC and which are rightful the assets of Dantzig, including any interest and/or other types of profits realized from the use of said assets.

## **JURY DEMAND**

127.    Plaintiff requests a jury trial with respect to all claims so triable.

**WHEREFORE**, Plaintiff requests the following relief:

A) Compensatory damages, including but not limited to lost compensation and the value of NHCP to Dantzig, the value of the NHCP co-investment vehicle to Dantzig, and

the value of Dantzig's services, in an amount to be determined at trial, believed to be at least $13,500,000;

B)  Consequential damages including but not limited to lost compensation and the value of NHCP and the co-investment vehicle to Dantzig, in an amount to be determined at trial;

C)  General damages, including but not limited to compensation for the damage to Dantzig's reputation, in an amount to be determined at trial;

D)  A constructive trust on all assets rightfully belonging to Dantzig but in possession, custody, or control of one or more of the Defendants;

E)  Punitive damages;

F)  Pre- and post-judgment interest; and

G)  All other relief that this Court deems just and proper.

Dated: December 12, 2016                    LIDDLE & ROBINSON, L.L.P.


                                            _____
                                                Jeffrey L. Liddle
                                                James W. Halter
                                            800 Third Avenue, 8th Floor
                                            New York, NY 10022
                                            Phone: (212) 687-8500
                                            *Attorneys for Plaintiff*

**EXHIBIT A**

| Date | Title | Parties | Abbreviation |
|------|-------|---------|--------------|
| September 1, 2011 | New Health Capital Partners Management LP Services Agreement | New Health Capital Partners Management LP; Baxter; and ORIX AM Holdings, LLC | Baxter Service Agreement |
| September 1, 2011 | New Health Capital Partners Management LP Services Agreement | New Health Capital Partners Management LP; Dantzig; and ORIX AM Holdings, LLC | Dantzig Service Agreement |
| September 1, 2011 | Investment Agreement | ORIX AM Holdings, LLC; ORIX AM Investments, LLC; Baxter; Dantzig; New Health Capital Partners GP LLC; New Health Capital Partners Management LP; and New Health Capital Partners Management GP LLC | Investment Agreement |

| September 1, 2011 | Limited Liability Company Agreement of New Health Capital Partners GP LLC | Dantzig; Baxter; and ORIX AM Investments, LLC | Operating Agreement |
| --- | --- | --- | --- |
| September 1, 2011 | New Health Capital Partners Fund I LP, Agreement of Limited Partnership | New Health Capital Partners GP LLC; ORIX AM Investments, LLC; Baxter; Dantzig; and New Health Capital Partners Management LP | Fund I LPA |
| September 1, 2011 | Investment Management Agreement | New Health Capital Partners Fund I LP; and New Health Capital Partners Management LP | Fund I IMA |
| September 1, 2011 | Limited Liability Company Agreement of New Health Capital Partners Management GP LLC | Dantzig; Baxter; and ORIX AM Holdings, LLC | Management GP Operating Agreement |

| September 1, 2011 | Limited Partnership Agreement of New Health Capital Partners Management LP | Dantzig; Baxter; ORIX AM Holdings, LLC; and New Health Capital Partners Management GP LLC | Management LP Agreement |
| --- | --- | --- | --- |
| September 1, 2011 | New Health Capital Partners Management LP, Confidentiality, Non-Competition and Non-Solicitation Agreement | New Health Capital Partners Management LP; Dantzig; and ORIX AM Holdings, LLC | Dantzig Non-Compete Agreement |
| September 1, 2011 | New Health Capital Partners Management LP, Confidentiality, Non-Competition and Non-Solicitation Agreement | New Health Capital Partners Management LP; Baxter; and ORIX AM Holdings, LLC | Baxter Non-Compete Agreement |
| December 1, 2011 | Investment Management Agreement | New Health SBI Co-invest LLC; and New Health Capital Partners Management LP | SBI Co-Invest Investment Management Agreement |

| December 1, 2011 | New Health SBI Co-invest LLC, Amended and Restated Limited Liability Company Agreement | New Health SBI Co-Invest MM LLC; New Health Capital Partners GP LLC; and other members. | SBI Co-Invest LLC Agreement |
|---|---|---|---|