## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARON DANTZIG,<br><br>                    Plaintiff,<br><br>          -against-<br><br>ORIX AM HOLDINGS, LLC, ORIX ASSET MANAGEMENT, LLC, ORIX AM INVESTMENTS, LLC, ORIX GLOBAL ASSET MANAGEMENT, LLC (f/k/a ORIX USA ASSET MANAGEMENT, LLC), ORIX CORPORATION, and ORIX USA CORPORATION,<br><br>                    Defendants, and<br><br>NEW HEALTH CAPITAL PARTNERS GP LLC; NEW HEALTH CAPITAL PARTNERS MANAGEMENT LP; NEW HEALTH CAPITAL PARTNERS MANAGEMENT GP LLC, and NEW HEALTH CAPITAL PARTNERS FUND I, LLC,<br><br>                    Nominal Defendants. | Case No. 16 Civ. 07097 (LLS)<br><br>**FIRST AMENDED<br>VERIFIED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Aron Dantzig, by and through his undersigned counsel, alleges as follows:

### <u>NATURE OF THE ACTION</u>

1.    Plaintiff seeks recovery from Defendants for: (i) breaches of the various written contracts entered into by and between the parties; (ii) inducing the breaches of those contracts, (iii) breach of the covenant of good faith and fair dealing, (iv) tortious interference with contracts, (v) tortious interference with prospective economic advantage, (vi) breach of fiduciary duty and (vii) imposing a constructive trust upon ORIX AM Investments, LLC, based on Defendants' conduct in taking control of and dissolving a private-equity fund (Nominal Defendant New Health Capital Partners Fund I, LLC).

2.      In September 2011, Plaintiff Aron Dantzig ("Dantzig") and a third party, Richard Baxter ("Baxter"), on the one hand, and the Defendants, on the other, entered into an agreement where Dantzig and Baxter would operate healthcare-focused private-equity funds through an entity named New Health Capital Partners ("NHCP") and Defendants would be investors. Defendants committed $150 million of investment capital to NHCP. This amount was committed in two parts: (1) a $100 million capital commitment to New Health Capital Partners Fund I ("Fund I"), a healthcare private-equity fund, and (2) a $50 million capital commitment to a second healthcare private-equity fund (referred to as "Fund II"). In exchange, Dantzig and Baxter agreed to manage the investments of both funds, as co-portfolio managers, for at least two years after the launch of Fund II.

3.      Based in substantial part on Dantzig's efforts, the NHCP partnership and Fund I were extremely successful. Within approximately seven months of launching Fund I, NHCP had made successful investments for the entire $100 million commitment. Fund I was projected to generate at least a 14% gross unlevered return by 2019, and approximately $40-$50 million of gross profit for ORIX. In addition, NCHP's efforts to raise Fund II had been successfully launched, with a first closing on Fund II expected in the summer of 2013.

4.      In May 2013, Defendants brought all of this to a halt in violation of the agreements between the parties. The precipitating event was Baxter's stated intention to resign as a partner and co-portfolio manager from NHCP.

5.      Thereafter, in June 2013, Defendants met with Baxter in secret to enlist Baxter's help in a plan to reap the benefits of Fund I but deprive Dantzig of his contractual share of the management fees, carried interest incentive income related to Fund I, and other bargained-for rights under the agreements.

6.      Defendants offered to pay Baxter more than he was entitled to under the contracts (see Exhibit C hereto) as well as release Baxter from a litany of onerous post-deal restraints and non-competition agreements that would otherwise have severely limited his ability to work—an offer Defendants could not make unilaterally under the agreements as Dantzig had an independent ability to enforce Baxter's non-compete agreement—if Baxter helped Defendants cut Dantzig out of his contractually-earned compensation.

7.      Defendants sought to avoid, and have avoided, paying millions of dollars in fees and carried interest incentive income to Dantzig and sought to avoid making good on their contractual obligations, capital commitment and ongoing management fees owed to NHCP for Fund I and Fund II.

## JURISDICTION AND VENUE

8.      Plaintiff initially filed a summons with notice in the New York Supreme Court on June 24, 2016. Jurisdiction in that court was based on the agreements between the parties and the conduct committed within New York and which caused injury to Dantzig in New York. N.Y. C.P.L.R. §§ 301 and 302.

9.      On September 12, 2016, Defendants removed this matter to this Court. Thus, the burden is on Defendants to establish jurisdiction and venue in this Court.

## PARTIES

10.     Plaintiff Aron Dantzig is an individual residing at 7117 N. 68th Place, Paradise Valley, Arizona.

11.     Defendant ORIX AM Holdings, LLC is a Delaware limited liability company with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201.

12.     Defendant ORIX AM Investments, LLC is a Delaware limited liability company with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201.

13.     Defendant ORIX Global Asset Management, LLC ("ORIX GAM, LLC") is a Delaware limited liability company with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201. ORIX GAM, LLC was formerly known as ORIX USA Asset Management, LLC.

14.     Defendant ORIX USA Corporation is a Delaware corporation with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201.

15.     Defendant ORIX Asset Management, LLC is purported to be a Delaware limited liability company with its principal place of business located at 1717 Main Street, Suite 900, Dallas, Texas 75201. Several of the agreements between the parties are signed by "ORIX Asset Management LLC, a Delaware limited liability company" in addition to the other ORIX entities. Also, Defendants sent correspondence in this matter as "ORIX Asset Management, LLC." The Secretary of State of Delaware has no records of this "company" and Defendants claim it does not exist. (Dkt. No. 1 at ¶ 6). ORIX Asset Management, LLC is named as Defendant in this action should it be found to have a separate identity from the other ORIX entities.

16.     Defendant ORIX Corporation is a Japanese corporation with its principal place of business located at World Trade Center Bldg., 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo, 105-6135, Japan. ORIX Corporation's policies and practices required it to be involved in and approve decisions by the other ORIX entities with respect to investments of the size of ORIX's investment in NHCP. Individuals involved in ORIX's decision-making and conduct with respect to Dantzig and NHCP were jointly employed by ORIX Corporation and other ORIX defendants.

17.     All Defendants, ORIX AM Holdings, LLC, ORIX AM Investments, LLC, ORIX GAM, LLC, ORIX USA Corporation, ORIX Asset Management, LLC, and ORIX Corporation, are referred to collectively herein as "ORIX" or the "ORIX Defendants."

18.     With respect to the conduct described herein, ORIX acted jointly and without consideration of the particular entities at issue. ORIX's decision-making power was centralized among a handful of individuals and those individuals made decisions on behalf of all ORIX entities. In discussions with Dantzig, ORIX did not differentiate between the various Defendants here.

19.     Nominal Defendant New Health Capital Partners GP, LLC is a Delaware limited liability company with its principal place of business located at 1350 Avenue of the Americas, 9th Floor, New York, New York 10019. When created in 2013, Plaintiff owned 50% of New Health Capital Partners GP, LLC. Despite no longer having any actual or practical control over the company, **Plaintiff** remains the 50% owner of New Health Capital Partners GP, LLC. ORIX sends Plaintiff tax documents every year reporting profit and loss from Plaintiff's putative ownership however, ORIX and New Health Partners GP, LLC have never paid Plaintiff any of this alleged income since he was terminated.

20.     Nominal Defendant New Health Capital Partners Management, LP is a Delaware limited partnership with its principal place of business located at 1350 Avenue of the Americas, 9th Floor, New York, New York 10019. When created in 2013, Plaintiff was the 100% owner of New Health Capital Partners Management, LP. Despite no longer having any actual or practical control over the company, **Plaintiff** remains the 100% owner of New Health Capital Partners Management, LP. ORIX sends Plaintiff tax documents every year reporting profit and loss from

Plaintiff's putative ownership however, ORIX and New Health Partners Management, LP have never paid Plaintiff any of this alleged income since he was terminated.

21.     Nominal Defendant New Health Capital Partners Management GP, LLC is a Delaware limited liability company with its principal place of business located at 1350 Avenue of the Americas, 9th Floor, New York, New York 10019. When created in 2013, Plaintiff was the 100% owner of New Health Capital Partners Management GP, LLC. Despite no longer having any actual or practical control over the company, *Plaintiff* remains the 100% owner of New Health Capital Partners Management GP, LLC. ORIX sends Plaintiff tax documents every year reporting profit and loss from Plaintiff's putative ownership however, ORIX and New Health Partners Management GP, LLC have never paid Plaintiff any of this alleged income since he was terminated.

22.     Nominal Defendant New Health Capital Partners Fund I, LLC is a Delaware limited liability company with its principal place of business located at 1350 Avenue of the Americas, 9th Floor, New York, New York 10019.

23.     New Health Capital Partners GP, LLC, New Health Capital Partners Management, LP, New Health Capital Partners Management GP, LLC, and New Health Capital Partners Fund I, LLC are collectively referred to herein as "NHCP."

24.     The Nominal Defendants, as parties to the contracts breached, may have their rights affected by this litigation and are, thus, named as defendants to the extent they may be deemed necessary parties to this action. ORIX, however, is the governing entity, the entity that caused Dantzig damages, and the entity in possession of the funds that should have been conveyed to Dantzig.

25.     Attached hereto as Exhibit A is a chart of the agreements between the parties and the definitions of those documents used herein.

26.     Attached hereto as Exhibit B is a chart showing the structure of the NHCP entities.

## FACTS

27.     Dantzig and Baxter had previously worked together for approximately six years for Fortress Investment Group, LLC, from 2004 to 2010.

28.     In approximately November 2010, ORIX USA Corporation approached Dantzig and Baxter about ORIX funding a private-equity vehicle.

29.     In approximately January 2011, Dantzig, Baxter, and ORIX USA Asset Management, LLC executed a term sheet.

30.     Through the term sheet, ORIX, Dantzig, and Baxter agreed upon a joint venture to start, invest in, and manage a private-equity vehicle focuses on healthcare investment opportunities. The parties agreed to share the profits in certain proportions and allocation of expenses.

31.     The parties negotiated for several months thereafter through in September 2011, when Dantzig, Baxter, and ORIX agreed to create several entities and enter into several written agreements to facilitate their joint venture. Pursuant to September 2011 agreements, Dantzig and Baxter were to operate healthcare-focused private-equity funds through NHCP and Defendants would be a seed investor in NHCP.

32.     At that time, ORIX committed $150 million in capital to NHCP. First, pursuant to the express terms of the Service Agreements, and in conjunction with the various other NHCP

agreements, ORIX agreed to make a $100 million capital commitment to New Health Capital Partners Fund I ("Fund I"), a healthcare-focused private-equity fund.

33.     Second, pursuant to the agreements, ORIX made a $50 million capital commitment to NHCP's next healthcare-focused private equity Fund (referred to as "Fund II") provided certain delineated conditions were met.

34.     In exchange, Dantzig and Baxter each agreed to devote their full efforts to managing ORIX's investments in Fund I and Fund II and maximizing NHCP's value for at least two years after the launch of Fund II. (*See, e.g.*, Services Agreements § 2).

35.     Dantzig and Baxter also agreed to make investments into the joint venture and purchase shares of various NHCP entities including personally investing in Fund I through New Health Capital Partners GP, LLC. Dantzig made such a cash contribution to the New Health Capital Partners GP, LLC.

36.     In addition, Dantzig and Baxter both individually agreed to onerous Confidentiality, Non-Competition and Non-Solicitation provisions ("Dantzig Non-Compete Agreement" and "Baxter Non-Compete Agreement") which restricted their activities until 18 months after their employment ended.

37.     Fund I launched in September 2011.

38.     NHCP's investments for Fund I were very successful. Within approximately seven months of launching Fund I, NHCP had fully committed the fund's entire $100 million in capital in three investments. Fund I was projected to generate at least a 14% gross unlevered return by 2019, and approximately $40-$50 million of gross profit for ORIX. One of those investments, a senior secured loan to a medical device company, generated greater than a 25% gross unlevered return in June 2014 when the loan was repaid and the investment was fully

realized, a gross profit to ORIX of approximately $18 million on that transaction alone. Over this same time period to 2019, Dantzig's compensation from Fund I was projected to total approximately $2.7 million in salary and approximately $2.5 million in carried interest incentive income.

39.     Fund I made three investments. For one of Fund I's investments, NHCP and ORIX sought and obtained outside investors ("third-party investors") to invest with them.

40.     The investment that included these third-party investors was referred to as the "SBI Co-Investment."

41.     The SBI Co-Investment had its own set of entities and agreements. NHCP and ORIX created a New Health SBI Co-Invest LLC with a New Health SBI Co-Invest MM LLC as its managing member. The other members of New Health SBI Co-Invest LLC were Dantzig, Baxter, and the third parties. Dantzig and Baxter each made capital contributions to New Health SBI Co-Invest LLC, and were each members of New Health SBI Co-Invest LLC.

42.     New Health Capital Partners Management LP was the investment manager of New Health SBI Co-Invest LLC and received management fees and other compensation for doing so. (SBI Co-Invest Investment Management Agreement § 7).

43.     New Health Capital Partners Management LP was entitled to notice to any amendments to the New Health SBI Co-Invest LLC documents. (SBI Co-Invest Investment Management Agreement § 5(b)).

44.     By May 2013, NHCP had substantially met the preconditions stated in the governing documents for Fund II, which would have triggered ORIX's $50 million commitment and its continuing obligation to pay management fees for both Fund I and Fund II. (*See, e.g.*, Investment Agreement § 7.01; Operating Agreement §§ 5.11 and 5.12; Management GP

Operating Agreement §§ 5.11 and 5.12; Management LP Operating Agreement § 5.13 and 5.14). By May 2013, NHCP had commitments of approximately $50 million from two blue-chip institutional investors for Fund II, and additional institutional investors were performing due diligence in contemplation of a commitment to Fund II. In addition to the preconditions being substantially met, the explicit expiration provisions with respect to ORIX's capital commitment to Fund II had not occurred. (Investment Agreement § 7.01(b)).

45.     Fund II would have launched but-for ORIX's conduct described herein.

46.     Compensation for Fund II to Dantzig and NHCP would be additive to the compensation described above for Fund I. Plus, with this opportunity to bring in additional investors, the economic magnitude for Fund II and the resulting opportunities were significantly greater.

47.     Notwithstanding these successes, on May 10, 2013, Baxter informed Dantzig that the previous day (May 9, 2013), he (Baxter) had informed ORIX that he intended to resign from NHCP.

48.     At the time the agreements were drafted, the parties had specifically contemplated and extensively negotiated the procedures that would occur in the event of resignation by either Baxter or Dantzig prior to the second anniversary of the closing of Fund II. The parties' agreements devote several pages to that possibility, all of which Defendants ignored at the time they cut Dantzig out of his contractual rights.

49.     Because Baxter intended to leave prior to the two-year anniversary of *Fund II*, he was characterized as a "Bad Leaver" under the contracts. (Services Agreement §§ 3(b) and 6(b); Management LP Operating Agreement, Definition of "Bad Leaver"). In addition, Baxter intended to work for a competitor which would have created an independent ground for Baxter to

be deemed a "Bad Leaver." (Baxter Non-Compete Agreement; Management LP Operating Agreement, Definition of "Bad Leaver").

50.     The documents explicitly describe the contemplated procedures, economic impact, and mechanism for replacing the resigning partner. (*See, e.g.*, Operating Agreement §§ 5.1, 5.2, and 13.5 and Schedules A-1, A-2, and A-3; Management GP Operating Agreement §§ 5.1, 5.2 and 13.5; Management LP Operating Agreement § 5.2). They entailed that the remaining individuals would propose a replacement partner and that the parties consent to the replacement, among other provisions.

51.     Also, pursuant to the terms of the agreements, Baxter's resignation should have triggered the forfeiture of certain compensation and equity interests of Baxter and the potential to reassign them to a replacement. (*See, e.g.*, Operating Agreement § 13.5 and Schedules A-1, A-2, and A-3; Management GP Operating Agreement § 13.5; Management LP Operating Agreement § 13.5). At the time, Dantzig expected the parties to comply with these extensively-bargained-for rights and immediately began good-faith efforts to replace Baxter as required under the governing agreements.

52.     Further, Baxter was subject to the Baxter Non-Compete Agreement after his resignation from NHCP, including restrictions on the types of business for which he could work and restrictions on the potential employees, clients, and investors he could solicit.

53.     Baxter wanted ORIX and NHCP to waive the restrictive covenants of the Baxter Non-Compete Agreement, including the relevant provisions restricting the solicitation of NHCP employees.

54.     Upon information and belief, Baxter would not leave NHCP unless the Baxter Non-Compete Agreement was waived.

55.     Under the contracts, independent of whether ORIX chose to enforce the Baxter Non-Compete Agreement, Dantzig had his own ability to enforce the agreement. Dantzig made clear that he would not waive the Baxter Non-Compete Agreement, and Baxter made clear that he would not leave unless it was waived by all parties. Thus, to get the cooperation from Baxter that it wanted, ORIX needed to remove Dantzig's ability to enforce the Baxter Non-Compete Agreement.

56.     Upon learning of Baxter's intention to resign, ORIX deliberately and prematurely began to end NHCP's operations, without making a good faith effort to work with Dantzig to preserve and optimize the partnership value, franchise value, and good will of NHCP, including NHCP's management of Fund I, the SBI Co-Investment, and Fund II, and refused to assist Dantzig in his efforts to replace Baxter. ORIX thus violated its express and implied obligations to Dantzig and to NHCP. (*See, e.g.*, Services Agreements § 4; Fund I LPA Article IV; Operating Agreement §§ 5.6 and 13.5; Management GP Operating Agreement §§ 5.6 and 13.5; Management LP Operating Agreement § 5.8).

57.     Attached hereto as Exhibit C is an email chain that includes a June 25, 2014 email from Mike Kelly ("Kelly"), then-CEO of ORIX USA Asset Management, to Baxter. Kelly describes that "Orix is being very fair in [its] proposal based on the written agreement and the restrictions it would bind you to should you decide to leave right now. Our economic proposal is as far as we will go given the circumstances. We will need to provide an incentive for those here on our side to help us on an ongoing basis with these assets so will need the economics for that. We also would like to move quickly now on winding things down so we will need to know whether you accept our proposal in the next 24 hours."

58.     Dantzig was intentionally not included on the email and ORIX and Baxter intentionally did not tell Dantzig that ORIX and Baxter were negotiating conditions and the economics of Baxter leaving the NHCP venture.

59.     ORIX offered to: (1) permit Baxter to leave the venture and get out of his obligations to NHCP; (2) not deem Baxter to be a Bad Leaver despite the numerous provisions of the documents that required that he receive such treatment; (3) increase the compensation Baxter would otherwise be entitled to under the agreements; (4) release Baxter from the non-compete provisions; and (5) manufacture a way that Dantzig could not to enforce the non-compete provisions despite the fact that Dantzig's rights to do so were specifically and intentionally bargained for by Dantzig in agreeing to the documents..

60.     To receive this favorable treatment, Baxter had to cooperate with ORIX in: (1) providing notice of future termination of Dantzig's employment with the purpose of involuntarily removing Dantzig from the various boards immediately; (2) denying Dantzig the compensation he was entitled to under the agreements; and (3) voting with ORIX to have ORIX take control of Fund I and the assets.

61.     Baxter agreed to ORIX's proposal.

62.     ORIX and Baxter could not have accomplished their goal through the documents themselves. The contractual triggering events for a No Fault Dissolution had not occurred and, even if they, dissolution would have taken months to accomplish and would not have denied Dantzig of his contractual compensation. (Operating Agreement § 5.11; Management GP Operating Agreement § 5.11; Management LP Operating Agreement § 5.13). Similarly, a board vote to dissolve the funds would not have removed Dantzig from the board of the NHCP entities and in fact, upon Baxter leaving, would have triggered the requirement that Dantzig nominate

additional board members that were not affiliated with ORIX such that the Board consist of two non-ORIX members (including Dantzig) and one ORIX member. (Operating Agreement § 5.1(a); Management GP Operating Agreement § 5.1(a)). This provision enabled Dantzig to continue to enforce the Baxter Non-Compete Agreement. In addition, a board vote to dissolve Fund I would not have released ORIX's contractual obligations to Dantzig and NHCP related to the SBI Co-Investment. Thus, ORIX and Baxter needed to breach the contracts and violate the covenant of good faith and fair dealing to accomplish their respective goals.

63.     Dantzig, on the other hand, made significant efforts to abide by the various agreements and to preserve NHCP's value.

64.     First, Dantzig tried to convince Baxter to reconsider his decision and remain with NHCP. Baxter, however, would not reconsider, apparently because ORIX had cut a secret deal with Baxter that increased his compensation and permitted him to violate his non-compete provisions even absent Dantzig's consent.

65.     Second, when it became apparent that Baxter would not reconsider, Dantzig began transition planning. In June 2013, pursuant to the governing agreements, Dantzig sent ORIX several presentations concerning transition plans, including plans to replace Baxter, all of which were designed to preserve the value of NHCP and to enable it to continue to operate successfully.

66.     A potential replacement candidate Dantzig proposed was highly qualified. ORIX, however, refused to even consider the applicant, in violation of its implied covenant of good faith and fair dealing and its duties to the partnership and its partners. (*See, e.g.*, Operating Agreement § 5.1(a); Management GP Operating Agreement § 5.1(a); Management LP Operating

Agreement § 5.1(c)). Similarly, when Dantzig proposed three other highly-qualified candidates, ORIX refused to consider any of them.

67.     On July 1, 2016, ORIX also, in bad faith, refused Dantzig's efforts to schedule a Board of Directors meeting for early July 2013 to proceed with the transition planning and to bring to the board for ratification Dantzig's selection of extremely qualified replacement Key Persons. (*See, e.g.*, Operating Agreement § 5.1(c); Management GP Operating Agreement § 5.1(c)). Rather than fulfill its obligation to preserve the value of NHCP (which included working in good faith to find a replacement Key Person for the Board), ORIX deliberately and in violation of the relevant agreements: (1) stopped paying contractually-owed management fees to NHCP—which under the agreements, belonged at least partially to Dantzig and would have belonged fully to Dantzig upon Baxter leaving; (2) eliminated NHCP's on-going partnership value—of which Dantzig was, and remains, an investor and the 100% owner; (3) assumed control over NHCP's operations; (4) refused to go forward with Fund II, and (5) ultimately expelled Dantzig. (*See, e.g.*, Operating Agreement §§ 5.1(a) and 5.6; Management GP Operating Agreement §§ 5.1(a) and 5.6; Management LP Operating Agreement § 5.8).

68.     Instead, on or around July 2, 2013, one day after Dantzig requested a meeting of the Board of Directors, ORIX sent a letter to Danzig falsely stating "[ORIX] has no choice but to pursue the dissolution of Fund I [and] the wind-down of NHCP." ORIX made no mention of its side agreement with Baxter and provided no further explanation for this decision that was not in the interest of NHCP or Dantzig.

69.     The governing agreements specifically prohibited agreements between members such as ORIX and Baxter without full knowledge of all members, arms-length negotiations, and Board approval. (Operating Agreement §§ 5.10 and 15.5(b); Management LP Operating

Agreement §§ 5.12 and 15.5(b); Management GP Operating Agreement §§ 5.10 and 15.5(b)). Thus, the secret agreement between ORIX and Baxter in June 2014 to provide notice of termination to Dantzig in order to immediately remove Dantzig from the relevant boards and cooperate in depriving him of his contractual rights (and to not enforce the non-compete agreement against Baxter), which was not disclosed, not arms-length, and not approved by the Board, explicitly breached the governing documents. (Operating Agreement §§ 5.10 and 15.5(b); Management GP Operating Agreement §§ 5.10 and 15.5(b); Management LP Operating Agreement §§ 5.12 and 15.5(b)).

70.    This conduct by ORIX and Baxter deprived Dantzig of all of the intended benefits of the agreements after he had substantially performed his obligations. (*See, e.g.*, Services Agreements § 4; Fund I LPA Article IV; Operating Agreement §§ 14.1, 15.5(b); Management GP Operating Agreement §§ 5.6, 14.1 and 15.5(b); Management LP Operating Agreement §§ 5.8, 14.1 and 15.5(b)).

71.    On July 11, 2013, Dantzig responded to ORIX's July 2, 2013 letter stating that he would not agree to resign; would not agree to the dissolution of Fund I; and would not agree to wind down NHCP. Dantzig also referenced the sections of the governing agreements that required "approval of the dissolution of the Company [NHCP] by a Majority-in-Interest of the Non-OAM Members with the prior written consent of the OAM Member ...." before New Health Capital Partners GP LLC, New Health Capital Partners Management LP, or New Health Capital Partners Management GP LLC could be dissolved. (*See, e.g.*, Management GP Operating Agreement § 14.1; Management LP Operating Agreement § 14.1). Dantzig was unaware that ORIX had already arranged for Baxter's cooperation to try to manufacture this approval.

72.     None of the performance triggers had occurred that would have permitted ORIX to dissolve the fund. (Operating Agreement § 5.11; Management GP Operating Agreement § 5.11; Management LP Operating Agreement § 5.13). Thus, pursuant to the governing agreements, ORIX could not complete its desired dissolution of NHCP if Dantzig refused to vote with ORIX to do so.

73.     In the July 11, 2013 letter, Dantzig further invoked his rights as a member, principal, and Director of NHCP to be "actively involved with any discussions [ORIX] may have with Baxter about Baxter's potential resignation." In the July 11, 2013 letter, Dantzig also stated that "[i]f [ORIX] continues to desire to unwind this otherwise profitable venture, Mr. Dantzig would be willing to discuss reasonable terms for his departure." Unbeknownst to Dantzig, in violation of the agreements, those discussions had already occurred and led to the agreement between ORIX and Baxter described above. (*See, e.g.*, Operating Agreement §§ 5.10 and 15.5(b); Management GP Operating Agreement §§ 5.10 and 15.5(b); Management LP Operating Agreement §§ 5.12 and 15.5(b))

74.     Minutes after receiving Dantzig's July 11, 2013 letter, ORIX sent an email to Dantzig stating that it had decided to provide notice of termination of his employment without cause effective January 11, 2014. This document was signed by both ORIX and Baxter.

75.     At the time it provided notice of future termination of his employment, ORIX forced Dantzig to resign immediately from the Board and from all Board committees. This was the outcome ORIX and Baxter needed to ensure Dantzig would not be able to enforce the non-compete provisions against Baxter.

76.     By providing notification of future termination of Dantzig's employment, forcing him to resign immediately from the Board and all associated committees, and entering into its

secret agreement with Baxter, ORIX was able to create the appearance of having the required votes needed to dissolve NHCP and Fund I and thereby avoid ongoing management fees payable to NHCP for Fund I, and future management fees and committed capital obligations to NHCP for Fund II. (*See, e.g.*, Services Agreements § 4; Fund I LPA §§ 3.2, Article IV; Management GP Operating Agreement §§ 5.6 and 14.1; Management LP Operating Agreement §§ 5.8 and 14.1). Of note, ORIX and Baxter formed their side agreement to manufacture this result weeks before providing notice of termination to Dantzig . (*See* Exhibit C).

77.     On July 12, 2013, one day after sending Dantzig notice of termination of his employment (effective six months thereafter), ORIX began implementing its dissolution of Fund I, the SBI Co-Investment, and NHCP, in a manner contrary to the governing agreements and denying Dantzig the compensation he had previously earned and should have earned throughout the dissolution process.

78.     Within days of providing Dantzig notice of the future termination of his employment (effective in six months), ORIX and Baxter immediately disseminated to investors and counterparties false information that Dantzig was no longer an employee of NHCP, and that the "Key Person" provision had been triggered—meaning that Dantzig was no longer working for the company. (*See, e.g.*, Operating Agreement § 13.3(b); Management GP Operating Agreement § 13.3(b); Management LP Operating Agreement § 13.3(b); Fund I LPA § 4.11; SBI Co-Invest LLC Agreement § 6.5(c)). In fact, Dantzig remained an employee and member of NHCP until January 11, 2014 and it was, in fact, Baxter that had triggered the Key Person provision by intending to be, and becoming, a "Bad Leaver" as defined in the agreements.[1] (*See, e.g.*, Operating Agreement § 1.1; Management LP Operating Agreement § 1.1).

---

[1] Baxter commenced work for a competitor of NHCP within four months of July 2013, rather than the required 18 months, in breach of several of the governing agreements.

79.   By disseminating this false information, ORIX disparaged Dantzig and placed Dantzig in a false light with NHCP's then-existing investors, potential investors, counterparties, service providers, and employees. (*See, e.g.*, Operating Agreement § 13.3(b); Management LP Operating Agreement § 13.3(b); and Management GP Operating Agreement § 13.3(b)). By falsely stating that Dantzig's employment had been terminated effective immediately, it created the implication that Dantzig had engaged in wrongdoing or that there was cause to fire him, rather than the required six-month notice that Dantzig was entitled upon a termination without cause.

80.   After receiving notice of his future termination, Dantzig tried to acquire Fund I's assets as part of his continuing efforts to preserve the partnership's value. On August 9, 2013, he sent a letter to Kelly informing ORIX that he "would like to express [his] earnest interest and financial ability to acquire [all or a portion of Fund I's assets]." Dantzig pointed out that he was extremely familiar with the assets and that he had an obligation to the partners and shareholders of Fund I (including the SBI co-investors) to maximize the value of Fund I and the SBI Co-Investment.

81.   ORIX never substantively considered Dantzig's proposal.

82.   On October 1, 2013, Dantzig sent an email to Kelly again "expressing [his] willingness and financial ability (via a financial partner) to acquire the assets which presently reside in New Health Capital Partners Fund I." This time, Dantzig attached to his email a signed letter of financial support from one of the world's largest asset management firms, with assets under management exceeding $300 billion, (Dantzig's "Financial Partner"). Individuals at this Financial Partner also tried to reach out to Kelly several times about their desire to partner with

Dantzig and purchase the assets. Kelly did not respond to the Financial Partner's efforts to reach him.

83.     ORIX again did not substantively consider Dantzig's proposal. ORIX never provided any basis for its refusal to even consider Dantzig's offers to acquire Fund I's assets, which was in the best interest of the partnership.

84.     On or before November 2014, Baxter was working for a competitor of NHCP and had hired a former NHCP employee in violation of the Non-Compete Agreement. Thus, from at least that point, Dantzig was the only principal of NHCP and should still have been receiving management fees with respect to Fund I. Pursuant to the Fund I LPA, ORIX's efforts to dissolve the fund due to a Key Person event (either Baxter or Dantzig) required at least 135 days but ORIX did not pay Dantzig the management fees and other incentive compensation due during that timeframe. (Fund I LPA §§ 3.2 and 4.11).

85.     ORIX later sold Fund I's assets to other parties, receiving substantially less value for the assets than the price offered by Dantzig. (*See, e.g.*, Management GP Operating Agreement § 5.6; Management LP Operating Agreement § 5.8). Doing so damaged Dantzig as an investor in Fund I, and the associated investment attribution of Fund I. In addition, ORIX, in violation of the relevant agreements, eliminated NCHP's investment management agreement, and associated economic value, related to a NHCP sponsored co-investment vehicle (the "SBI Co-Investment"), that included third party investors. (*See, e.g.*, SBI Co-Invest Investment Management Agreement §§ 1, 2, 7, and 14; SBI Co-Invest LLC Agreement Articles 7.1 and XI). Dantzig was, and remains, the 100% owner of the relevant NHCP entities.

## DAMAGE TO DANTZIG

86.     As a result of its conduct, ORIX intentionally and wrongfully ended NHCP's operations prematurely. This damaged Dantzig by denying him: (1) his portion of the compensation and other value built up in NHCP by successfully operating and managing NHCP, including the fee income related to Fund I, (2) the value of NHCP's investment management agreement with the SBI Co-Investment, and (3) the compensation derived from operating and managing NHCP's intended Fund II. (*See, e.g.*, Services Agreements § 4; Fund I LPA Article IV; Operating Agreement § 5.2; Management GP Operating Agreement §§ 5.2 and 5.6; Management LP Operating Agreement §§ 5.2 and 5.8; SBI Co-Invest Investment Management Agreement §§ 1, 2, 7, and 14; SBI Co-Invest LLC Agreement Articles 7.1 and XI).

87.     In addition, under the governing documents, Baxter's intended resignation prior to the two-year anniversary of the Closing of Fund II, rendered Baxter a "Bad Leaver," and entitled Dantzig to a reassignment of a portion of Baxter's carried interest, management fees, and other incentive compensation, among other compensation and rights. (*See, e.g.*, Operating Agreement § 1.1 and Schedules A-1, A-2, and A-3; Management LP Operating Agreement §§ 1.1 and 13.5). Dantzig did not receive the compensation to which he was entitled.

88.     Further, as of July 1, 2013, the NHCP management company held cash in the amount of approximately $800,000 for past management fees already paid to NHCP—almost all of which should have been paid to Dantzig pursuant to the agreements. In fact, Dantzig had already paid taxes on a portion of this compensation. ORIX took this $800,000 from Dantzig when it took control of NHCP and, in violation of the agreements, took control of NHCP's bank accounts. Dantzig has not received any portion of the $800,000.

89.     In addition, ORIX owed NHCP management fees through, at least, the first quarter of 2014 in the amount of at least $706,000.[2] (*See, e.g.*, Fund I LPA §§ 3.2, 4.11 and 6.2). ORIX's conduct denied Dantzig his portion of the amount he was owed, which was nearly all of this amount given Baxter's formal and actual separation from NHCP in approximately September 2013.

90.     Dantzig also owned 50% of the carried interest related to NHCP's investment management agreement for the SBI Co-Investment, which was worth approximately $1,000,000. Upon Baxter's resignation, Dantzig was also entitled to approximately 50% of Baxter's carried interest on the SBI Co-Investment, which represents approximately an additional $500,000. (*See, e.g.*, Operating Agreement § 13.5 and Schedules A-1, A-2, and A-3; Management GP Operating Agreement § 13.5; Management LP Operating Agreement § 13.5). ORIX intentionally destroyed the value of NHCP's investment management agreement for the SBI Co-Investment which intentionally eliminated any portion of the carried interest which would have otherwise been payable to Dantzig. ORIX terminated NHCP's investment management agreement with respect to the SBI Co-Investment, destroying the franchise value and good will. (Operating Agreement § 9.1(f)). Thus, ORIX's conduct denied Dantzig approximately $1.25 million in carried interest he was owed and otherwise would have received per the terms of relevant agreements, including the SBI Co-Investment. (Operating Agreement § 9.1(f); SBI Co-Invest Investment Management Agreement § 7; SBI Co-Invest LLC Agreement Articles 3.3, VI, XII).

91.     ORIX's conduct also denied Dantzig the compensation and other benefits he would have received from Fund II. Fund II would have been worth $7,500,000 or more in fees

---

[2] Due to the timing requirements of the Fund I LPA, ORIX could not have avoided the management fees for the fourth quarter of 2013 and the first quarter of 2014, which would have resulted in $706,000 to NHCP, all of which should have been paid to Dantzig since Baxter was working for a competitor by November 2013 and Dantzig remained the sole owner of the relevant NHCP entities.

and carry to Dantzig. Given the success of Fund I and ability to make Fund II a larger fund, the likely value to Dantzig would have been much higher.

92. Further, ORIX has been sending Dantzig tax documents each year that indicate Dantzig is entitled to income from the NHCP entities that he still owns—Dantzig remains the 100% owner of New Health Capital Partners Management, LP and New Health Capital Partners Management GP, LLC and the 50% owner of New Health Capital Partners GP, LLC. Despite the fact that ORIX apparently expects Dantzig to pay taxes on this income, Defendants have not actually paid him any of the income described in the tax documents. Further, as the entities are still active, ORIX's fee obligations to the companies still exist and should have been paid.

93. Finally, despite that fact that ORIX chose not to enforce the Baxter Non-Compete Agreement against Baxter, ORIX did maliciously enforce the Dantzig Non-Compete Agreement against Dantzig, damaging his ability to work and solicit former NHCP employees for 18 months. To the extent ORIX purports to have exercised the No Fault Dissolution of NHCP, the Non-Compete Agreement should not have been enforceable against Dantzig. (Services Agreement § 1.33). ORIX did so anyway.

94. In addition, Dantzig would have been the sole remaining decision-maker for NHCP and could, independent of ORIX, appoint additional board members—it was a requirement of the documents that ORIX not control a majority of the board (Operating Agreement § 5.1(a); Management GP Operating Agreement § 5.1(a))—and to enforce the Baxter Non-Compete Agreement against Baxter. (*See, e.g.*, Operating Agreement §§ 5.10 and 15.5(b); Management GP Operating Agreement §§ 5.10 and 15.5(b); Management LP Operating Agreement §§ 5.12 and 15.5(b)). ORIX intentionally removed Dantzig's ability to enforce the agreement against Baxter and the value doing so had to Dantzig.

95.     There was no reasonable, good-faith, basis for ORIX to engage in the conduct it did on behalf of the NHCP entities or the SBI Co-Investment. ORIX's conduct destroyed all value of Fund I and the SBI Co-Investment to the NHCP entities and Dantzig and eliminated substantial compensation NHCP and Dantzig were entitled to without basis or NHCP or Dantzig receiving any benefits. By opting to dissolve Fund I, remove NHCP as investment manager for the SBI Co-Investment, and provide notice of termination of Dantzig's employment, ORIX intentionally sought to prematurely recoup its capital commitment in anticipatory repudiation of its obligations to Dantzig and NHCP.

96.     Further, without basis, ORIX intentionally paid Baxter more than he was entitled to under the governing agreements and refused to enforce the Baxter Non-Compete Agreement for the sole purpose of enlisting Baxter's help in its desire to gain the benefits of its capital commitment without it being required to pay the corresponding contractual benefits to Dantzig and NHCP.

97.     The conduct was designed solely to destroy Dantzig's contractual rights and to avoid ORIX's contractual obligations without conveying any benefits to NHCP or the SBI Co-Investment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT
### (Against All Defendants)

98.     Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

99.     Plaintiff and ORIX entered into numerous contracts governing their relationship.

100.    To the extent any of the ORIX entities did not directly execute the contracts, they are agents and alter egos of each other with respect to the contracts and knowingly accepted the

benefits of the contracts. The ORIX entities acted collectively without regard to corporate formalities.

101.    ORIX breached Section 2 of the Dantzig Service Agreement by wrongfully terminating his employment and removing him from the relevant boards.

102.    ORIX breached Section 4 of the Dantzig Service Agreement by withholding compensation that he earned.

103.    ORIX breached Section 7.01 of the Investment Agreement by failing "to use commercially reasonable efforts to finalize the" documents for Fund II, including by cooperating in appointing a replacement for Baxter (see, e.g., Operating Agreement § 5.1(a); Management GP Operating Agreement § 5.1(a); Management LP Operating Agreement § 5.1(c)), and by intentionally and in bad faith avoiding ORIX's contractual obligations with respect to Fund II.

104.    ORIX breached Section 5.1(a) of the Operating Agreement by manufacturing the removal of Dantzig from the Board, operating without three Board members including two non-ORIX members, and by refusing Dantzig's "commercially reasonable efforts to propose to [ORIX] additional Key Persons for Board membership." In fact, ORIX intentionally, and in bad faith, sought to avoid this express provision—ORIX wanted full control of the board, not the minority stake explicitly required under the agreements.

105.    ORIX breached Sections 5.2, 5.11, 5.12, and 9.1 of the Operating Agreement by failing to establish Fund II, failing to consent to Fund II, and denying Dantzig the management fees and incentive income described therein. ORIX also breached Section 5.2 of the Operating Agreement by not maximizing the value of Fund I and the SBI Co-Investment and failing to properly compensate Dantzig upon the sale of the SBI Co-Investment and the other Fund I investments to third parties.

106.    ORIX breached Section 5.11 of the Operating Agreement by dissolving the Fund without a defined event occurring.

107.    ORIX breached Section 13.3(b) of the Operating Agreement by disparaging Dantzig when ORIX falsely informed investors, employees, and others that Dantzig was no longer an employee in July 2013 when he, in fact, remained an employee through January 2014.

108.    ORIX breached Section 13.5 of the Operating Agreement by failing to reassign Baxter's "units" of NHCP to Dantzig.

109.    ORIX breached Section 14.1 of the Operating Agreement by dissolving and winding up NHCP entities without approval of the "Majority-in-Interest of the Non-[ORIX] Members."

110.    ORIX breached Section 14.2 of the Operating Agreement by failing to distribute Dantzig's economic interests in NHCP by the end of the taxable year of liquidation.

111.    ORIX breached Section 15.5(b) of the Operating Agreement by attempting to amend the agreements between the parties other than in writing and without more than 75% of the non-ORIX members.

112.    Since, at the time Baxter left NHCP, Dantzig was still an employee—his notice of termination was not effective until January 2014, ORIX breached Schedules A-1, A-2, and A-3 of the Operating Agreement by failing to reassign Baxter's economics to Dantzig upon Baxter leaving.

113.    ORIX breached Section 5.1(a) of the Management GP Operating Agreement by manufacturing the removal of Dantzig from the Board, operating without three Board members including two non-ORIX members, and by refusing Dantzig's "commercially reasonable efforts to propose to [ORIX] additional Key Persons for Board membership." In fact, ORIX

intentionally, and in bad faith, sought to avoid this express provision—ORIX wanted full control of the board, not the minority stake explicitly required under the agreements.

114.    ORIX breached Section 5.1(c) of the Management GP Operating Agreement by failing to attend and participate in a Board meeting upon reasonable notice.

115.    ORIX breached Sections 5.2, 5.11, 5.12 and 9.1 of the Management GP Operating Agreement by failing to establish Fund II, failing to consent to Fund II, and denying Dantzig the management fees and incentive income described therein. ORIX also breached Section 5.2 of the Management GP Operating Agreement by not maximizing the value of Fund I and the SBI Co-Investment and failing to properly compensate Dantzig upon the sale of the SBI Co-investment and the other Fund I investments to third parties.

116.    ORIX breached Section 5.6 of the Management GP Operating Agreement by failing "to preserve the good will and franchise value of the Company" by improperly removing assets and compensation from NHCP and failing to maximize the value of Fund I's investments and of the SBI Co-Investment.

117.    ORIX breached Section 5.10 of the Management GP Operating Agreement by secretly negotiating, and agreeing with Baxter, to: (1) increase Baxter's contractual compensation, (2) wind-down NHCP's operations, (3) provide notice of future termination of Dantzig's employment, and (4) deny Dantzig is contractual compensation, all without Dantzig's knowledge, in non-arms-length negotiations, and without Board approval.

118.    ORIX breached Section 5.11 of the Management GP Operating Agreement by dissolving the Fund without a defined event occurring.

119.    ORIX breached Section 13.3(b) of the Management GP Operating Agreement by disparaging Dantzig when ORIX falsely informed investors, employees, and others that Dantzig

was no longer an employee in July 2013 when he, in fact, remained an employee through January 2014.

120.    ORIX breached Section 13.5 of the Management GP Operating Agreement by failing to reassign Baxter's "units" of NHCP to Dantzig.

121.    ORIX breached Section 14.1 of the Management GP Operating Agreement by dissolving and winding up NHCP entities without approval of the "Majority-in-Interest of the Non-[ORIX] Members."

122.    ORIX breached Section 14.2 of the Management GP Operating Agreement by failing to distribute Dantzig's economic interests in NHCP by the end of the taxable year of liquidation.

123.    ORIX breached Section 15.5(b) of the Management GP Operating Agreement by attempting to amend the agreements between the parties other than in writing and without more than 75% of the non-ORIX members and otherwise without Dantzig's consent.

124.    ORIX breached Sections 5.2, 5.13, 5.14, and 9.1 of the Management LP Operating Agreement by: (1) failing to establish Fund II, (2) failing to consent to Fund II, (3) denying Dantzig the management fees and incentive income described therein, and (4) failing to work with Dantzig to honor ORIX's obligations to maximize NHCP's franchise value and good will by working with Dantzig to establish Fund II. ORIX also breached Section 5.2 of the Management LP Operating Agreement by failing to properly compensate Dantzig upon the sale of the SBI Co-investment and the other Fund I investments to third parties.

125.    ORIX breached Section 5.8 of the Management LP Operating Agreement by failing "to preserve the good will and franchise value of the Company," improperly removing

assets and compensation from NHCP and failing to maximize the value of Fund I's investments and of the SBI Co-Investment.

126.    ORIX breached Section 5.12 of the Management LP Operating Agreement by secretly negotiating with, and agreeing with Baxter, to: (1) increase Baxter's contractual compensation, (2) wind-down NHCP's operations, (3) provide notice terminating Dantzig's employment, and (4) deny Dantzig his contractual compensation and his other bargained-for benefits and rights under the agreements, all without Dantzig's knowledge, in non-arms-length negotiations, and without Board approval.

127.    ORIX breached Section 5.13 of the Management LP Operating Agreement by dissolving the Fund without a defined event occurring and failing to pay Dantzig his economic interest in the NHCP entities.

128.    ORIX breached Section 13.3(b) of the Management LP Operating Agreement by disparaging Dantzig when ORIX falsely informed investors, employees, and others that Dantzig was no longer an employee in July 2013 when he, in fact, remained an employee through January 2014.

129.    ORIX breached Section 13.5 of the Management LP Operating Agreement by failing to reassign Baxter's "units" of NHCP to Dantzig.

130.    ORIX breached Section 14.1 of the Management LP Operating Agreement by dissolving and winding up NHCP entities without approval of the "Majority-in-Interest of the Non-[ORIX] Members."

131.    ORIX breached Section 14.2 of the Management LP Operating Agreement by failing to distribute Dantzig's economic interests in NHCP by the end of the taxable year of liquidation.

132.    ORIX breached Section 15.5(b) of the Management LP Operating Agreement by attempting to amend the agreements between the parties other than in writing and without more than 75% of the non-ORIX members and otherwise without Dantzig's consent.

133.    ORIX breached Article IV of the Fund I LPA by failing to pay Dantzig the profits he earned and failing to pay Dantzig the distributions reflected in the tax documents ORIX sent to him.

134.    ORIX breached Section 4.11 of the Fund I LPA by failing to follow the procedures set forth therein (and in other sections of the agreements) upon Baxter announcing his attention to leave the venture, including by failing to wait at least 90 days to try to end the venture (plus another 15-days notice to remove the investment manager and 30 days of notice t dissolve the fund) and by failing to pay Dantzig for his interest in NHCP where the section requires that NHCP be deemed to have the rights of a limited partner. The Fund I LPA requires management fees to be paid for additional quarters, including during a timeframe when Baxter was no longer working at NHCP and Dantzig was still an owner of NHCP, but ORIX failed to make those payments.

135.    ORIX breached Section 5.1(e) of the Fund I LPA by failing to appoint an appropriate liquidator of Fund I when required to do so.

136.    ORIX breached Sections 3.2 and 6.2 of the Fund I LPA by denying Dantzig the management fees and incentive income described therein, including the approximately $800,000 in an NHCP account that almost entirely belonged to Dantzig, a substantial portion of which Dantzig had already paid taxes.

137.    ORIX breached Sections 1, 2, 7, and 14 of the SBI Co-Invest Investment Management Agreement by terminating Dantzig's employment and removing NHCP as the

investment manager, thus denying Dantzig the incentive compensation to which he was entitled for his work in managing the investments of the SBI Co-Investment and destroying the franchise value and good will to NHCP, in violation of the agreements.

138.    ORIX breached Section 3.3, Article VI, Section 6.5 of the SBI Co-Invest LLC Agreement by terminating Dantzig's employment and removing NHCP as the investment manager, thus denying Dantzig the incentive compensation to which he was entitled for his work in managing the investments of the SBI Co-Investment and destroying the franchise value and good will to NHCP, in violation of the agreements.

139.    ORIX breached Section 7.1, Articles XI and XII of the SBI Co-Invest LLC Agreement by taking control of the SBI Co-Investment, amending the documents, and selling it without following the procedures in the agreement, including by failing to get the consent of Dantzig as an investor and Member for changes that affected him or paying Dantzig the incentive compensation to which he was entitled.

140.    ORIX breached Section 3.4 of the SBI Co-Invest LLC Agreement by failing to resolve the conflict between members ORIX and Dantzig in a way that is "fair and equitable to the Company, the Members, and the Managing Member," and by failing to "promptly provide notice and an explanation of such conflicts to Members."

141.    ORIX breached Section 1.33 of the Dantzig Non-Compete Agreement by enforcing the non-compete agreement without authority to do so.

142.    Plaintiff has been damaged by ORIX's conduct in an amount to be proven at trial. Dantzig's damages include:

        a.   The $800,000 taken from NHCP that almost entirely belonged to Dantzig;

b.   Removing Dantzig's employment and post-employment health and other benefits;

c.   Dantzig's contractual compensation from Fund I of approximately $2.7 million in salary and approximately $2.5 million in carried interest incentive income;

d.   Dantzig's compensation from the SBI Co-Investment, including approximately $1.5 million in carried interest and additional amounts due to Dantzig as an investor and member upon the sale of the investment;

e.   NHCP distributions that have been reflected in tax documents issued to Dantzig based on his continued ownership of the NHCP entities that were never paid to Dantzig;

f.   Dantzig's contractual compensation from Fund II of at least $7.5 million in fees and carried interest incentive income which likely would have been much greater.

143.   Thus, due to ORIX's breaches of contract, Dantzig is entitled to at least $13,500,000, plus pre- and post-judgment interest and costs.

**SECOND CAUSE OF ACTION – INDUCING BREACH OF CONTRACT**
**(Against Defendants ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX**
**Corporation, and ORIX USA Corporation)**

144.   Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

145.   Plaintiff and ORIX entered into numerous contracts governing their relationship.

146.   To the extent ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX Corporation, and ORIX USA Corporation are not found to be direct parties to the contracts regarding NHCP, each induced the remaining ORIX Defendants to breach the contracts.

147.    ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX Corporation, and ORIX USA Corporation each knew of the contracts between ORIX and Plaintiff.

148.    Despite this knowledge, ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX Corporation, and ORIX USA Corporation knowingly induced ORIX to breach the contracts such that Dantzig would be denied his contractual benefits.

149.    As described in paragraphs 101 to 141, which are incorporated herein, by their conduct, ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX Corporation, and ORIX USA Corporation induced ORIX to breach at least the following provisions: Sections 2 and 4 of the Services Agreement; Section 7.01 of the Investment Agreement; Sections 5.1(a), 5.2, 5.11, 5.12, 9.1, 13.3(b), 13.5, 14.1, 14.2, and 15.5(b) and Schedules A-1, A-2, and A-3 of the Operating Agreement; Sections 5.1(a), 5.1(c), 5.2, 5.6, 5.10, 5.11, 5.12, 9.1, 13.3(b), 13.5, 14.1, 14.2, and 15.5(b) of the Management GP Operating Agreement; Sections 5.2, 5.8, 5.12, 5.13, 5.14, 9.1, 13.3(b), 13.5, 14.1, 14.2, and 15.5(b) of the Management LP Operating Agreement, Article IV and Sections 3.2, 4.11, 5.1(e), and 6.2 of the Fund I LPA, Sections 1, 2, 7, and 14 of the SBI Co-Invest Investment Management Agreement, Articles 3.3, 3.4, VI, 7.1, XI, and XII of the SBI Co-Invest, LLC Agreement, and Section 1.33 of the Dantzig Non-Compete Agreement.

150.    Plaintiff has been damaged by ORIX's conduct in an amount to be proven at trial. Dantzig's damages include:

    a.    The $800,000 taken from NHCP that almost entirely belonged to Dantzig;

    b.    Removing Dantzig's health and other employment benefits;

    c.    Dantzig's contractual compensation from Fund I of approximately $2.7 million in salary and approximately $2.5 million in carried interest incentive income;

d.   Dantzig's   compensation   from   the   SBI   Co-Investment,   including
approximately $1.5 million in carried interest and additional amounts due to
Dantzig as an investor and member upon the sale of the investment;

e.   NHCP distributions that have been reflected in tax documents issued to
Dantzig based on his continued ownership of the NHCP entities that were
never paid to Dantzig;

f.   Dantzig's contractual compensation from Fund II of at least $7.5 million in
fees and carried interest incentive income which likely would have been much
greater.

151.   Thus,   due   to   ORIX's   breaches   of   contract,   Dantzig   is   entitled   to   at   least
$13,500,000, plus pre- and post-judgment interest and costs.

### THIRD CAUSE OF ACTION –BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Against All Defendants)

152.   Plaintiff   incorporates   and   realleges   all   of   the   foregoing   allegations   of   the
Complaint.

153.   Plaintiff and ORIX entered into numerous contracts governing their relationship.

154.   ORIX was required to meet its obligations and exercise any discretion under the
contracts pursuant to the implied covenant of good faith and fair dealing.

155.   ORIX, however, took the conduct described above with the intent to deny Dantzig
of his intended benefits under the contracts.

156.   Dantzig had substantially performed his duties under the NHCP agreements by
identifying, negotiating, and managing three investments which were quite profitable for the
venture. ORIX, however, denied Dantzig the intended benefits of his work by prematurely
cutting him out of the contracts and taking all of the benefits for itself.

157.    Thus, where explicit contractual provisions do not govern ORIX's conduct or the contracts provide ORIX with discretion to act, ORIX's conduct blatantly breached the implied covenant of good faith and fair dealing with respect to the contracts.

158.    Plaintiff has been damaged by ORIX's conduct in an amount to be proven at trial. Dantzig's damages include:

    a.   The $800,000 taken from NHCP that almost entirely belonged to Dantzig;

    b.   Removing Dantzig's health and other employment benefits;

    c.   Dantzig's contractual compensation from Fund I of approximately $2.7 million in salary and approximately $2.5 million in carried interest incentive income;

    d.   Dantzig's compensation from the SBI Co-Investment, including approximately $1.5 million in carried interest and additional amounts due to Dantzig as an investor and member upon the sale of the investment;

    e.   NHCP distributions that have been reflected in tax documents issued to Dantzig based on his continued ownership of the NHCP entities that were never paid to Dantzig;

    f.   Dantzig's contractual compensation from Fund II of at least $7.5 million in fees and carried interest incentive income which likely would have been much greater.

159.    Thus, due to ORIX's breaches of contract, Dantzig is entitled to at least $13,500,000, plus pre- and post-judgment interest and costs.

**FOURTH CAUSE OF ACTION – TORTIOUS INTERFERENCE
WITH BAXTER NON-COMPETE AGREEMENT
(Against All Defendants)**

160.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

161.    Dantzig should have been the sole remaining decision-maker for NHCP and could, independent of ORIX, appoint additional board members—it was the intent of the documents that ORIX not control a majority of the board—and to enforce the Baxter Non-Compete Agreement against Baxter. Defendants intentionally sought to permanently remove Dantzig's ability to enforce the agreement against Baxter and the value which doing so had to Dantzig.

162.    ORIX, in bad faith, intentionally removed Dantzig from that decision-making process and secretly negotiated with Baxter directly with the intent of depriving Dantzig of his bargained-for contractual rights under the agreements.

163.    As a result, ORIX intentionally disrupted and eliminated Dantzig's ability, through NHCP, to enforce the Baxter Non-Compete Agreement.

164.    In fact, had Dantzig been able to enforce the Baxter Non-Compete Agreement, Dantzig would have received, and would continue to receive, all of the benefits of NHCP, Fund I, the SBI Co-Investment, and Fund II.

165.    The fact that Baxter was able to work for a competing business and solicit former NHCP employees while ORIX enforced the Dantzig Non-Compete Agreement against Dantzig resulted in direct and proximate damage to Dantzig's career—including damage to his reputation and loss of compensation—in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION – TORTIOUS INTERFERENCE**
**WITH THE SBI CO-INVESTMENT**
**(Against All Defendants)**

166.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

167.    ORIX was aware of the investment management agreements related to the SBI Co-Investment. Those agreements involved third parties other than Dantzig, NHCP, and ORIX.

168.    Also as ORIX was aware, those agreements conveyed several substantial benefits to Dantzig.

169.    Dantzig invested money in the SBI Co-Investment and was a member of New Health SBI Co-Invest LLC.

170.    Dantzig would have been the sole remaining managing partner of New Health Capital Partners Management LP, and as such, would have been able to honor NHCP's contractual obligations, and been entitled to the full economic benefits, of the investment management agreement related to the SBI Co-Investment.

171.    Despite this knowledge, ORIX intentionally, and in bad faith, disrupted and eliminated Dantzig's rights with respect to NHCP's investment management agreement for the SBI Co-Investment by intentionally destroying NHCP's control, and all economic benefits, associated with the investment management agreement, and eliminating Dantzig's rights and compensation otherwise due and payable from the SBI Co-Investment.

172.    ORIX also denied Dantzig of all of his rights and compensation as a member of New Health SBI Co-Invest LLC.

173.    ORIX's conduct directly and proximately resulted in substantial damage to Dantzig, including by denying him: (1) the compensation he was entitled to pursuant to NHCP's

investment management agreement for the SBI Co-Investment, and (2) the value of the SBI Co-Investment to Dantzig.

### SIXTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (Against All Defendants)

174.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

175.    ORIX intentionally and maliciously manufactured a situation where Dantzig needed new employment.

176.    ORIX then chose to enforce the Dantzig Non-Compete Agreement against Dantzig while not enforcing the parallel agreement against Baxter. If NHCP claims to have exercised a No Fault Dissolution of NHCP, ORIX had no rights to enforce the Non-Compete Agreement at all. (Services Agreement § 1.33).

177.    ORIX also falsely informed investors, Dantzig's coworkers, and NHCP's counterparties that Dantzig was no longer an employee of NHCP as of July 2013, when he, in fact, remained employed through January 2014. Doing so created the incorrect inference that Dantzig committed some sort of misconduct that would warrant such an abrupt termination.

178.    ORIX further intentionally destroyed the value of NHCP by ceasing its operations, eliminating the track record and other career benefits Dantzig would have received from managing an extremely successful fund.

179.    By these acts, and others, ORIX intentionally interfered with Dantzig's reputation and ability to find comparable employment, or acted with reckless disregard to the same.

180.    ORIX's conduct directly and proximately resulted in substantial damage to Dantzig's career—including damage to his reputation and loss of compensation—in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION – BREACH OF FIDICIARY DUTY**
**(Against Defendants ORIX AM Holdings, LLC, ORIX Asset Management, LLC, ORIX**
**AM Investments, LLC, ORIX GAM, LLC and ORIX USA Corporation)**

181.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

182.    Plaintiff and ORIX entered into a joint venture with respect to NHCP.

183.    By virtue of the joint venture relationship, each joint venturer owed a fiduciary duty to one another.

184.    ORIX breached the fiduciary duty to Plaintiff by: (1) secretly negotiating with Baxter, (2) destroying the value of NHCP, (3) intentionally denying Plaintiff the proceeds of NHCP, (4) paying compensation to Baxter that was not owed to him and (5) deliberately breaching its obligations to maximize franchise value and good will.

185.    Plaintiff has been damaged by ORIX's conduct in an amount to be proven at trial. That amount, which includes, but is not limited to, the value of NHCP to Dantzig and the compensation he earned for his work for NHCP, exceeds $13,500,000.

**EIGHTH CAUSE OF ACTION – QUANTUM MERUIT**
**(Against All Defendants)**

186.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

187.    Dantzig performed his services for ORIX exceptionally well and in good faith. He reasonably expected to be compensated at an appropriate rate for his services.

188.    ORIX accepted Dantzig's services knowing of Dantzig's expected compensation.

189.    ORIX's conduct denied Dantzig of that expected compensation.

190.    ORIX owes Dantzig the reasonable value of services in an amount to be proven at trial.

## NINTH CAUSE OF ACTION – UNJUST ENRICHMENT
### (Against All Defendants)

191.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

192.    ORIX was unjustly enriched by Dantzig's services.

193.    Dantzig conferred several benefits upon ORIX.

194.    ORIX has unjustly retained and accepted those benefits without adequately or appropriately compensating Dantzig.

195.    Dantzig is entitled to just compensation for the benefit that his services conferred upon ORIX in an amount to be proven at trial.

## TENTH CAUSE OF ACTION – CONSTRUCTIVE TRUST
### (Against Defendant ORIX AM Investments, LLC)

196.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

197.    ORIX AM Investments, LLC and Dantzig are members of New Health Capital Partners GP LLC.

198.    In that capacity, ORIX AM Investments, LLC had a confidential and fiduciary relationship towards Dantzig.

199.    ORIX AM Investments, LLC was aware of the contractual rights and obligations owed to Dantzig.

200.    Dantzig managed New Health Capital Partners Management LP, New Health Capital Partners Management GP, LLC, and New Health Capital Partners GP LLC, and devoted resources to them in reliance on the contractual rights and compensation he was entitled to receive from them.

201.    ORIX AM Investments, LLC surreptitiously took possession and control of New Health Capital Partners Management LP, New Health Capital Partners Management GP, LLC, and New Health Capital Partners GP LLC, and has not made the appropriate management decisions regarding the company or the companies it manages nor has it made appropriate distributions to Dantzig.

202.    Dantzig remains the 100% owner of New Health Capital Partners Management LP, the 100% owner of New Health Capital Partners Management GP, LLC, and the 50% owner New Health Capital Partners GP LLC. ORIX, however, has denied Dantzig any involvement in the management of these companies, and even denied him the income he is due as a result of his ownership, despite providing Dantzig with tax documents reflecting income that he has not been paid.

203.    As such, Dantzig is entitled to the imposition of a constructive trust on all assets in the possession, custody, and/or control of ORIX AM Investments, LLC which originated from New Health Capital Partners GP LLC and which are rightfully the assets of Dantzig, including any interest and/or other types of profits realized from the use of said assets.

**ELEVENTH CAUSE OF ACTION –DERIVATIVE CLAIM FOR BREACH OF CONTRACT AND INDUCING BREACH OF CONTRACT**
**(Against the ORIX Defendants)**

204.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

205.    In the event it is determined that any of Plaintiff's claims of breach of contract, either explicit or implicit breach of the covenant of good faith and fair dealing, are not appropriately pled as direct claims of Plaintiff, Plaintiff hereby asserts them, in the alternative, as derivative claims on behalf of NHCP and the SBI-Co-Investment entities.

206.    NHCP, the SBI Co-Investment entities, Dantzig, Baxter, and ORIX entered into the binding agreements referenced in the attached Exhibit A.

207.    To the extent ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX Corporation, and ORIX USA Corporation are not found to be direct parties to the contracts regarding NHCP, each induced the remaining ORIX Defendants to breach the contracts.

208.    NHCP, the SBI Co-Investment entities, and Dantzig performed their obligations under the agreements.

209.    As described in paragraphs 101 to 141, which are incorporated herein, by their conduct, ORIX Asset Management, LLC, ORIX GAM, LLC, ORIX Corporation, and ORIX USA Corporation induced ORIX to breach at least the following provisions: Sections 2 and 4 of the Services Agreement; Section 7.01 of the Investment Agreement; Sections 5.1(a), 5.2, 5.11, 5.12, 9.1, 13.3(b), 13.5, 14.1, 14.2, and 15.5(b) and Schedules A-1, A-2, and A-3 of the Operating Agreement; Sections 5.1(a), 5.1(c), 5.2, 5.6, 5.10, 5.11, 5.12, 9.1, 13.3(b), 13.5, 14.1, 14.2, and 15.5(b) of the Management GP Operating Agreement; Sections 5.2, 5.8, 5.12, 5.13, 5.14, 9.1, 13.3(b), 13.5, 14.1, 14.2, and 15.5(b) of the Management LP Operating Agreement, Article IV and Sections 3.2, 4.11, 5.1(e), and 6.2 of the Fund I LPA, Sections 1, 2, 7, and 14 of the SBI Co-Invest Investment Management Agreement, Articles 3.3, 3.4, VI, 7.1, XI, and XII of the SBI Co-Invest, LLC Agreement, and Section 1.33 of the Dantzig Non-Compete Agreement.

210.    At all times relevant, Dantzig was, and remains the 100% owner of New Health Capital Partners Management, LP and New Health Capital Partners Management GP, LLC and the 50% owner of New Health Capital Partners GP, LLC. Dantzig fairly represents the members of the NHCP entities.

211.    Dantzig was also a member, equity owner, and investor in New Health SBI Co-

Invest LLC. Dantzig fairly represents the members of New Health SBI Co-Invest LLC.

212.    As a result, of ORIX's breaches, ORIX destroyed nearly all value in the NHCP entities and of New Health SBI Co-Invest LLCs. Doing so damaged Dantzig as a member, equity holder, and investor in the NHCP entities and New Health SBI Co-Invest LLC.

213.    Any demand upon the NHCP entities or upon New Health SBI Co-Invest LLC to bring this action directly against ORIX would have been futile.

214.    ORIX itself controls all decision-making power of the relevant entities. Thus, ORIX would be antagonist to such a demand, adversely interested in initiating action against itself, and was itself involved in the transactions at issue.

215.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

216.    As a result of ORIX's breaches, the NHCP entities and New Health SBI Co-Invest LLC, and indirectly Dantzig, have been damaged in an amount to be proven at trial.

### TWELFTH CAUSE OF ACTION – DERIVATIVE CLAIM FOR TORTIOUS INTERFERENCE WITH BAXTER NON-COMPETE AGREEMENT (Against the ORIX Defendants)

217.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

218.    In the event it is determined that any of Plaintiff's claims of tortious interference with the Baxter Non-Compete Agreement, are not appropriately pled as direct claims of Plaintiff, Plaintiff hereby asserts them, in the alternative, as derivative claims on behalf of NHCP.

219.    New Health Capital Partners Management LP, at all time relevant, was a party to the Baxter Non-Compete Agreement. ORIX was aware of the Baxter Non-Compete Agreement.

220.    By the conduct described above, including by failing to cooperate in Dantzig's efforts to replace Baxter to avoid the requirement that the NHCP Board always consist of a

majority of non-ORIX controlled members (Operating Agreement § 5.1(a); Management GP Agreement § 5.1(a)), and by removing Dantzig as a board member, ORIX, in bad faith, intentionally and tortiously interfered with NHCP's ability to enforce the Baxter Non-Compete Agreement.

221.    Had NHCP been able to enforce the Baxter Non-Compete Agreement, NHCP and Dantzig would have received, and would continue to receive, all of the benefits of NHCP, Fund I, the SBI Co-Investment, and Fund II.

222.    Any demand upon the NHCP entities to bring this action directly against ORIX would have been futile.

223.    ORIX itself controls all decision-making power of the relevant entities. Thus, ORIX would be antagonist to such a demand, adversely interested in initiating action against itself, and was itself involved in the transactions at issue.

224.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

225.    The fact that Baxter was able to work for a competing business and solicit former NHCP employees damaged NHCP and Dantzig in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION – DERIVATIVE CLAIM FOR TORTIOUS INTERFERENCE WITH THE SBI CO-INVESTMENT
### (Against the ORIX Defendants)

226.    Plaintiff incorporates and realleges all of the foregoing allegations of the Complaint.

227.    NHCP had various agreements governing its relationship with the SBI Co-Investment.

228.    From those agreements, NHCP was entitled to substantial compensation from the SBI Co-Investment, including management fees and other compensation.

229.    ORIX was aware of NHCP's agreements related to the SBI Co-Investment. Those agreements involved third parties other than Dantzig, NHCP, and ORIX.

230.    Also as ORIX was aware, those agreements conveyed several substantial benefits to NHCP.

231.    Despite this knowledge, ORIX intentionally, and in bad faith, disrupted and eliminated NHCP's rights with respect to NHCP's agreements related to the SBI Co-Investment by intentionally destroying NHCP's control, and all economic benefits, associated with the investment management agreement and eliminating NHCP's rights and compensation otherwise due and payable from the SBI Co-Investment.

232.    Any demand upon the NHCP entities to bring this action directly against ORIX would have been futile.

233.    ORIX itself controls all decision-making power of the relevant entities. Thus, ORIX would be antagonist to such a demand, adversely interested in initiating action against itself, and was itself involved in the transactions at issue.

234.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

235.    ORIX's conduct directly and proximately resulted in substantial damage to NHCP, including by denying it: (1) the compensation NHCP was entitled to pursuant to its agreements related to the SBI Co-Investment, and (2) the value of the SBI Co-Investment to NHCP.

## JURY DEMAND

236.    Plaintiff requests a jury trial with respect to all claims so triable.

**WHEREFORE**, Plaintiff requests the following relief:

A) Compensatory damages, including but not limited to lost compensation and the value of NHCP to Dantzig, the value of Fund I to Dantzig, the value of the SBI Co-Investment to Dantzig, and the value of Dantzig's services, in an amount to be proven at trial, believed to be at least $13,500,000;

B) Consequential damages, including but not limited to lost compensation and the value of NHCP, Fund I, and the SBI Co-Investment to Dantzig, in an amount to be proven at trial;

C) General damages, including but not limited to compensation for the damage to Dantzig's reputation, in an amount to be proven at trial;

D) A constructive trust on all assets rightfully belonging to Dantzig but in possession, custody, or control of one or more of the Defendants;

E) In the alternative, on behalf of NHCP, recovery of the compensatory and consequential damages to NHCP and Dantzig from ORIX's conduct;

F) Punitive damages;

G) Pre- and post-judgment interest; and

H) All other relief that this Court deems just and proper.

Dated: March 17, 2017

LIDDLE & ROBINSON, L.L.P.

Jeffrey L. Liddle
James W. Halter
800 Third Avenue, 8th Floor
New York, NY 10022
Phone: (212) 687-8500
*Attorneys for Plaintiff*

## VERIFICATION OF COMPLAINT

STATE OF _ARIZONA_ )
                   )
COUNTY OF _YAVAPAI_ )

       I, Aron Dantzig, pursuant 28 U.S.C. § 1746, hereby affirm and verify under penalty of perjury as follows:

           1) I am the Plaintiff in this action.

           2) I have read the foregoing First Amended Verified Complaint. Based on my personal knowledge, I know the contents of the First Amended Verified Complaint, and affirm and verify that the same is true, except as to those matters alleged upon information and belief and, as to those matters, I believe them to be true.

I verify under penalty of perjury that the forgoing is true and correct.

Executed on March 17, 2017

                                   Aron Dantzig

AFFIRMED AND SUBSCRIBED before
me this 17ᵗʰ day of March 2017

          Notary Public

```
DAWN ALLISON SAXMAN
Notary Public - Arizona
Yavapai County
My Comm. Expires Aug 9, 2019
```

**EXHIBIT A**

| Date | Title | Parties | Abbreviation |
|---|---|---|---|
| September 1, 2011 | New Health Capital Partners Management LP Services Agreement | New Health Capital Partners Management LP; Baxter; and ORIX AM Holdings, LLC | Baxter Service Agreement |
| September 1, 2011 | New Health Capital Partners Management LP Services Agreement | New Health Capital Partners Management LP; Dantzig; and ORIX AM Holdings, LLC | Dantzig Service Agreement |
| September 1, 2011 | Investment Agreement | ORIX AM Holdings, LLC; ORIX AM Investments, LLC; Baxter; Dantzig; New Health Capital Partners GP LLC; New Health Capital Partners Management LP; and New Health Capital Partners Management GP LLC | Investment Agreement |

| September 1, 2011 | Limited Liability Company Agreement of New Health Capital Partners GP LLC | Dantzig; Baxter; and ORIX AM Investments, LLC | Operating Agreement |
|---|---|---|---|
| September 1, 2011 | New Health Capital Partners Fund I LP, Agreement of Limited Partnership | New Health Capital Partners GP LLC; ORIX AM Investments, LLC; Baxter; Dantzig; and New Health Capital Partners Management LP | Fund I LPA |
| September 1, 2011 | Investment Management Agreement | New Health Capital Partners Fund I LP; and New Health Capital Partners Management LP | Fund I IMA |
| September 1, 2011 | Limited Liability Company Agreement of New Health Capital Partners Management GP LLC | Dantzig; Baxter; and ORIX AM Holdings, LLC | Management GP Operating Agreement |

| | | | |
|---|---|---|---|
| September 1, 2011 | Limited Partnership Agreement of New Health Capital Partners Management LP | Dantzig; Baxter; ORIX AM Holdings, LLC; and New Health Capital Partners Management GP LLC | Management LP Operating Agreement |
| September 1, 2011 | New Health Capital Partners Management LP, Confidentiality, Non-Competition and Non-Solicitation Agreement | New Health Capital Partners Management LP; Dantzig; and ORIX AM Holdings, LLC | Dantzig Non-Compete Agreement |
| September 1, 2011 | New Health Capital Partners Management LP, Confidentiality, Non-Competition and Non-Solicitation Agreement | New Health Capital Partners Management LP; Baxter; and ORIX AM Holdings, LLC | Baxter Non-Compete Agreement |
| December 1, 2011 | Investment Management Agreement | New Health SBI Co-invest LLC; and New Health Capital Partners Management LP | SBI Co-Invest Investment Management Agreement |

| December 1, 2011 | New Health SBI Co-invest LLC, Amended and Restated Limited Liability Company Agreement | New Health SBI Co-Invest MM LLC; New Health Capital Partners GP LLC; and other members. | SBI Co-Invest LLC Agreement |
|---|---|---|---|

# EXHIBIT B



# EXHIBIT C

**Subject:** FW: follow up

**Date:**   Tuesday, June 25, 2013 5:50:48 PM Eastern Daylight Time

**From:**   Rich Baxter

To:      'Rich Baxter (rbbaxterjr@gmail.com)'

---

**From:** Rich Baxter
**Sent:** Tuesday, June 25, 2013 5:27 PM
**To:** jlaska@morrisoncohen.com
**Subject:** FW: follow up

---

**From:** Kelly, Mike [mailto:mike.kelly@orix.com]
**Sent:** Tuesday, June 25, 2013 3:35 PM
**To:** Rich Baxter
**Subject:** follow up

Rich - I understand your frustration with the outcome as we discussed, but we view where we are now with the team and the future of NHCP separately from your and Aron's duty toward overseeing the situation at Bioscan.  Orix is being very fair in our proposal based on the written agreement and the restrictions it would bind you to should you decide to leave right now.  Our economic proposal is as far as we will go given the circumstances.  We will need to provide an incentive for those here on our side to help us on an ongoing basis with these assets so will need the economics for that.  We also would like to move quickly now on winding things down so we will need to know whether you accept our proposal in the next 24 hours.  I appreciate your cooperation and look forward to a smooth transition.  Thanks, Mike